**Docket No. 25-**

# In the United States Court of Appeals For the Ninth Circuit

IN RE: GOOGLE PLAY STORE
SIMULATED CASINO-STYLE GAMES LITIGATION

IN RE: FACEBOOK SIMULATED
CASINO-STYLE GAMES LITIGATION

*On Petition for Permission to Appeal from the*
*United States District Court for the Northern District of California*
*The Honorable Edward J. Davila, District Judge*
*Case Nos. 5:21-md-03001-EJD, 5:21-CV-02777*

## PETITION OF GOOGLE LLC, GOOGLE PAYMENT CORP., AND META PLATFORMS, INC. FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292(b)

THEODORE J. BOUTROUS, JR.
CHRISTOPHER CHORBA
TIMOTHY LOOSE
PATRICK J. FUSTER
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
tboutrous@gibsondunn.com

*Counsel for Defendant-Petitioner Meta Platforms, Inc.*

(*additional counsel listed on inside cover*)

ELIZABETH B. PRELOGAR
EPHRAIM A. MCDOWELL
COOLEY LLP
1299 Pennsylvania Ave. NW
Washington, DC 20004
(202) 776-2115
eprelogar@cooley.com

TERESA H. MICHAUD
COOLEY LLP
355 S. Grand Avenue, Ste. 900
Los Angeles, CA 90071
(213) 561-3241

*Counsel for Defendants-Petitioners Google LLC and Google Payment Corp.*

COUNSEL PRESS INC. · (213) 680-2300 PRINTED ON RECYCLED PAPER

BRIAN M. WILLEN
WILSON SONSINI GOODRICH
& ROSATI, P.C.
1301 Sixth Ave, 40th Floor
New York, NY 10019
(212) 999-5800

LAUREN GALLO WHITE
WILSON SONSINI GOODRICH
& ROSATI, P.C.
One Market Plaza, Suite 3300
San Francisco, CA 94105
(415) 947-2000

*Counsel for Defendants-Petitioners*
*Google LLC and Google Payment Corp.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendants-Petitioners Google LLC, Google Payment Corp., and Meta Platforms, Inc. disclose the following:

Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Google Payment Corp. is a subsidiary of Google LLC. Google LLC is a subsidiary of XXVI Holdings Inc., which is a subsidiary of Alphabet Inc., a publicly traded company. No publicly traded company holds more than 10% of Alphabet Inc.'s stock.

Petitioner Meta Platforms, Inc. is a publicly traded corporation with no parent corporation. No publicly traded corporation owns more than 10% of its stock.

*/s/ Theodore J. Boutrous, Jr.*
Theodore J. Boutrous, Jr.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
tboutrous@gibsondunn.com

*Counsel for Defendant-Petitioner Meta Platforms, Inc.*

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar
Cooley LLP
1299 Pennsylvania Ave. NW
Washington, DC 20004
(202) 776-2115
eprelogar@cooley.com

*Counsel for Defendants-Petitioners Google LLC and Google Payment Corp.*

# TABLE OF CONTENTS


**Page**

INTRODUCTION ..... 1

QUESTION PRESENTED ..... 4

BACKGROUND ..... 4

A. Factual Background ..... 4

B. Procedural History ..... 6

REASONS THE APPEAL SHOULD BE PERMITTED ..... 13

A. The Section 230 Defense Is a Controlling Question of Law ..... 14

B. Substantial Ground for Difference of Opinion Exists as to Whether Section 230 Bars Plaintiffs' Claims ..... 14

C. Interlocutory Review Would Materially Advance Termination of the Litigation ..... 21

D. This Court Should Exercise Its Discretion to Grant Interlocutory Review ..... 21

RELIEF SOUGHT ..... 23

CERTIFICATE OF COMPLIANCE ..... 25

CERTIFICATE OF SERVICE ..... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) .................................................... 12-13

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ........................................................19

*Calise v. Meta Platforms, Inc.*,
103 F.4th 732 (9th Cir. 2024) .................................. 2, 12, 14, 15, 16, 17, 18, 19

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) .................................................... 22-23

*In re Cement Antitrust Litig.*,
673 F.2d 1020 (9th Cir. 1982) ..............................................14, 21, 22

*Coffee v. Google, LLC*,
No. 20-cv-03901, 2022 WL 94986
(N.D. Cal. Jan. 10, 2022) ............................................................20

*Couch v. Telescope Inc.*,
611 F.3d 629 (9th Cir. 2010) ........................................................20

*D'Augusta v. Am. Petroleum Inst.*,
117 F.4th 1094 (9th Cir. 2024) ........................................................4

*Doe 1 v. Twitter, Inc.*,
148 F.4th 635 (9th Cir. 2025) ........................................15, 16, 17, 19

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) .........................................22

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ....................................................16, 17

*ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*,
22 F.4th 1125 (9th Cir. 2022) ...............................................13, 14, 21

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*La Park La Brea A LLC v. Airbnb, Inc.*,
285 F. Supp. 3d 1097 (C.D. Cal. 2017) .......... 20

*Reese v. BP Exploration (Alaska) Inc.*,
643 F.3d 681 (9th Cir. 2011) .......... 14, 19, 21

*YZ Productions, Inc. v. Redbubble, Inc.*,
545 F. Supp. 3d 756 (N.D. Cal. 2021) .......... 20

**Statutes**

28 U.S.C. § 1292(b) .......... 1, 3, 8, 10, 12, 13, 14, 21, 22, 23

47 U.S.C. § 230 .......... *passim*

# INTRODUCTION

This case presents a critically important question about the scope of Section 230 of the Communications Decency Act, 47 U.S.C. § 230: whether it applies to claims seeking to hold online platforms liable for allegedly unlawful sales of virtual content within apps created by third-party content providers. The district court has now twice certified that question under 28 U.S.C. § 1292(b) because "[t]his case presents exceptional circumstances that are sufficient to justify an interlocutory appeal." Dkt. 80 at 36.[1] This Court previously granted interlocutory review on the question but had no occasion to resolve it because of a procedural issue that ultimately required dismissal of the appeal. *See In re Facebook Simulated Casino-Style Games Litig.*, No. 22-16888, Dkt. 97-1 (9th Cir. May 21, 2024). The Court invited the district court to "certify its order for interlocutory appeal" after curing that deficiency, *id.* at 8—and the district court has now done just that, *see* Dkt. 154 at 34-35. This Court should again grant review under Section 1292(b)—and this time, no procedural barrier will prevent the Court from resolving the significant and controlling question presented.

Google Play and Facebook are online businesses that host applications designed, created, and operated by third-party app developers. Those apps

---

[1] Citations to "Dkt." refer to the district court's docket in *In re: Google Play Store Simulated Casino-Style Games Litigation*, No. 21-md-3001 (N.D. Cal.).

frequently include virtual third-party content available for purchase, and it is alleged that Google and Meta retain a 30% commission on those purchases. This case concerns a genre of apps, known as "social casinos," that allow users to play versions of traditional casino games using virtual content that users win or purchase within the apps' built-in stores.

Plaintiffs have filed multiple putative class actions against Google, Meta, and Apple, seeking to hold them liable for hosting social casino apps. As relevant here, Plaintiffs claim that the Defendants' processing of sales for in-app content facilitates unlicensed gambling transactions, in violation of various state laws and the Racketeer Influenced and Corrupt Organizations Act (RICO). Defendants moved to dismiss under Section 230(c)(1), which bars claims seeking to "treat[]" online platforms "as the publisher . . . of any information provided by" a third party. 47 U.S.C. § 230(c)(1). This Court has recognized that Section 230 immunizes defendants from claims that "necessarily require" them "to monitor third-party content." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 741 (9th Cir. 2024) (citation omitted). Defendants contended that Section 230 bars Plaintiffs' claims because they would impose a duty on Defendants to actively review which apps provide social casino content and which sales of virtual content within those apps might qualify as allegedly unlawful gambling.

The district court denied Defendants' motion to dismiss in relevant part. *See* Dkt. 154 at 7-13. While the court acknowledged that "[t]he only way" that Defendants "can determine if they may or may not process a payment transaction is to cross-reference that transaction against the app it originated in," the court held that Section 230 did not apply because "Defendants can choose to stop offering their own payment processing" across the board and forgo the "millions if not billions" of dollars in resulting "revenue." *Id.* at 12-13. Only "if the termination of their payment processing services would pose an existential threat to Defendants," the court opined, would "such termination . . . not be an acceptable alternative to monitoring." *Id.* at 13. Thus, in the court's view, Section 230 immunity does not apply here because online services could avoid monitoring third-party content by fundamentally restructuring their businesses.

That unprecedented holding is flawed and warrants this Court's review under Section 1292(b). First, the district court's order "involves a controlling question of law," 28 U.S.C. § 1292(b), because it turns on a question of statutory interpretation that, if resolved in Defendants' favor, would bar Plaintiffs' claims. Second, the order cannot be squared with this Court's Section 230 precedents—and at the very least, "there is substantial ground for difference of opinion" as to whether the order is correct. *Id.* Third, "an immediate appeal from the order may materially advance the ultimate termination of the litigation," *id.*, because a reversal would require entry of

judgment for Defendants. Finally, this Court should exercise its discretion to hear this appeal because resolving the Section 230 issue now could avoid the need for sprawling, protracted multidistrict litigation involving numerous claims. And critically, a decision by this Court would provide much-needed guidance to the many online businesses that process sales of third-party virtual content. The Court should grant the petition and reverse.[2]

## QUESTION PRESENTED

Whether Section 230 bars claims that seek to hold online services liable for allegedly unlawful sales by third parties of their own virtual content within apps the third parties created, because Defendants allegedly process those in-app sales.

## BACKGROUND

### A. Factual Background

Google owns and operates an interactive computer service platform called Google Play. Dkt. 124 ¶ 47.[3] Third parties develop and upload apps to Google Play for consumers to view and download to their phones and tablets. *See id.* ¶ 53. Google provides all app developers the same suite of tools to facilitate the delivery of content to users. One such tool is a payment-processing service that allows app

---

[2] Google and Meta also support the granting of Apple's contemporaneously filed petition for interlocutory review.

[3] This factual background draws from the allegations in Plaintiffs' complaint, which are accepted as true for purposes of resolving Defendants' motion to dismiss. *See, e.g.*, *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100 (9th Cir. 2024).

developers to sell virtual content to consumers within their apps. *Id.* ¶ 61. Google allegedly retains a 30% commission for all sales of virtual content that it processes. *Id.* ¶ 73.

Meta offers Facebook as a service to allow people to engage socially, share information, and access entertainment. One feature allows third-party developers to offer online games for Facebook users to play. Some games are free, others cost money to play, and many are free to access but allow users to make in-app purchases of virtual content to enhance the gaming experience. Like Google, Meta hosts games and makes payment-processing tools available to all developers on the same terms. Dkt. 154 at 3. Meta also allegedly retains a 30% commission for all sales of virtual content that it processes. *Id.*

Social casinos are one genre of app available on both Google Play and Facebook. Dkt. 154 at 2. Although there is no standard definition of "social casino app," such apps typically allow users to play virtual versions of traditional casino games—such as slot machines, card games, and bingo—using virtual content designed to look like casino chips. Dkt. 124 ¶¶ 54-55. The developers of the social casino apps create and sell the virtual chips within the game. *Id.* ¶¶ 58-60. The chips are a form of online content, akin to a game player's avatar or the weapons a virtual character uses within a digital game. The apps offer an "initial allotment of virtual chips for free." *Id.* ¶ 58. If players run out of virtual chips, they can "wait for some

period of time before receiving more free chips" or "purchase virtual 'chips' in exchange for real money." *Id.* ¶¶ 3, 59-60. In turn, Google and Meta process the sale of virtual chips by social casino apps to consumers—just as they do with every in-app purchase of content for every app offered on Google Play or Facebook. *Id.* ¶ 61.

Unlike chips a player might purchase in a real-world casino, virtual chips cannot be cashed out. Dkt. 154 at 2. So, if a player were to pay $10 to purchase 100 virtual chips and then use those chips to win 100 additional chips, the player could not redeem the 200 chips for $20. Instead, virtual chips can be used only to play games within a specific social casino app or to "gift" to other players using that app. Dkt. 52 ¶ 63. The chips are thus virtual content that is inextricably intertwined with the social casino app itself.

### B. Procedural History

1. In late 2020 and early 2021, Plaintiffs filed multiple putative class actions around the country based on Google's hosting of social casino apps in the Google Play store. Dkt. 1 at 1. Those actions were centralized for pretrial purposes in the Northern District of California as a multidistrict litigation ("MDL"). *Id.* at 3. That Google MDL, along with a similar MDL against Apple and two similar class actions against Meta, were assigned to Judge Davila, who coordinated the cases. *Id.*

Plaintiffs assert four categories of claims: (1) loss-recovery clams under state

gambling statutes, *e.g.*, Dkt. 124 ¶¶ 173-181; (2) state unfair-competition law claims, *e.g.*, *id.* ¶¶ 140-164; (3) state unjust-enrichment claims, *e.g.*, *id.* ¶ 165-172; and (4) RICO claims based on Defendants' alleged involvement in an illegal "gambling enterprise," *id.* ¶¶ 548-574. All of these claims are premised on the theory that Defendants, by processing sales of third-party content within social casino apps, should be held liable for violating state laws prohibiting unlicensed gambling. The district court limited initial motion practice in the coordinated cases to the question of immunity under Section 230, Dkt. 68 at 2, recognizing that this defense could "completely preempt[] Plaintiffs' claims," Dkt. 66 at 1.

The district court granted Defendants' motions to dismiss in part and denied them in part. Dkt. 80 at 36. The court explained that "[t]he dispositive question in this case is whether the Platforms were 'publishers or speakers' within the meaning of 47 U.S.C. § 230(c)(1)." *Id.* at 12. In analyzing that issue, the court identified three distinct "theories of liability" underpinning Plaintiffs' claims and determined Section 230's applicability separately as to each theory. *Id.* at 31.

The district court held that Section 230 barred two of Plaintiffs' theories—namely, that Defendants "promoted the illegal casino applications in their App Stores," and "work[ed] with developers to increase user engagement" by providing advertising tools. *Id.* But the court also held that Section 230 did not bar Plaintiffs' theory that Defendants processed "*unlawful* transactions for *unlawful* gambling"

involving virtual chips. *Id.* at 33. The court did not apply that holding to any of Plaintiffs' claims or determine whether Plaintiffs' complaints could survive based only on their payment-processing allegations. *See id.* at 35.

The district court "*sua sponte*" certified its "order for immediate interlocutory appeal" under 28 U.S.C. § 1292(b). *Id.* at 36. The court explained that the "case presents exceptional circumstances that are sufficient to justify an interlocutory appeal." *Id.* It determined that the "case involves controlling questions of law, namely whether the Platforms are entitled to immunity for their hosting of the allegedly unlawful social casino apps." *Id.* It found that "reasonable minds could differ" as to whether Section 230 preempts Plaintiffs' payment-processing theory. *Id.* And it noted that if "the Ninth Circuit reverses" on that issue, "the case is resolved in its entirety," without the "significant and needless waste" of judicial resources adjudicating Plaintiffs' numerous claims. *Id.*

2. This Court then granted Defendants' petitions for interlocutory appeal under Section 1292(b). *See In re Facebook*, Dkt. 97-1 at 4. But after briefing and oral argument, the Court vacated its prior order granting permission for interlocutory appeal, dismissed the appeals for lack of appellate jurisdiction, and remanded to the district court. *Id.* at 8.

The Court determined that "the district court's certified order does not qualify as an 'order' under § 1292(b)," *id.* at 4, because it only "present[ed] the district

court's opinion on an abstract question of law without finally and definitively dismissing any claims," *id.* at 6. The Court observed that the district court "did not apply its ruling" on Section 230 "to each of the [Plaintiffs'] causes of action to determine which, if any, should be dismissed." *Id.* Thus, the Court concluded that if it were "to rule on the merits of the district court's dismissal of certain theories of liability" alone, it "would be issuing an advisory opinion." *Id.*

At the same time, the Court recognized that "in complex cases involving many claims, a district court may decide to address pivotal threshold issues—such as the viability of certain legal theories—before applying its reasoning to specific claims." *Id.* at 8. The Court emphasized that "[t]here is nothing wrong with such an approach." *Id.* And the Court made clear that "[o]nce the district court" had applied its analysis of the Section 230 "legal theories" to "the claims at issue" on remand, it could again "certify its order for interlocutory appeal." *Id.*

3. On remand, the district court ordered Plaintiffs to fill out a chart listing all claims and identifying which of the three theories of liability applied to each claim. Dkt. 107 at 1-2. In response, Plaintiffs provided a chart indicating that "all of Plaintiffs' claims are brought under a 'processing virtual chip payments' theory" and that "none of Plaintiffs' claims are brought under a 'promotion of social casino apps' theory." Dkt. 115 at 2. Plaintiffs noted that while none of their claims "are independently reliant on a theory that the Platform Defendants have provided

development assistance to casino app developers," "that category of conduct is relevant . . . insofar as that category of conduct is a predicate act toward the Platform Defendants' illegal processing of virtual chip transactions." *Id.* Plaintiffs filed an amended complaint. Dkt. 124.

4. The district court then followed this Court's instructions by addressing Defendants' Section 230 arguments, ruling on Plaintiffs' specific claims and theories, and again certifying its order for interlocutory appeal under Section 1292(b). As to Section 230, the court explained that the only disputed issue was whether Plaintiffs' claims sought to impose a duty that treated Defendants "as a publisher" of third-party content. Dkt. 154 at 7-8 (citation omitted). And the court indicated that this element "is satisfied *either* when a [legal] duty springs from status or conduct as a publisher *or* that duty compels monitoring" of third-party content. *Id.* at 8.

The district court "conclude[d] that none of the Plaintiffs' claims invoke duties that derive from Defendants' status or conduct as a publisher." *Id.* at 11. In the court's view, "[t]he crux" of Plaintiffs' claims "is that Defendants were prohibited from processing in-app payments for social casino apps." *Id.* And the court found that "[p]ayment processing is not an act of publishing," but rather "a transaction." *Id.*

The district court also concluded that the duties invoked by Plaintiffs' claims

do not "require" Defendants to "monitor[] . . . third-party content." *Id.* at 12. The court acknowledged that because "there is no independently maintained list of social casino apps," "[t]he only way [Defendants] can determine if they may or may not process a payment transaction is to cross-reference that transaction against the app it originated in." *Id.* But the court opined that "Defendants need not" "continue offering their own payment processing services" at all and could instead "allow app developers to use the services of dedicated third-party processors." *Id.* "In this way," the court stated, "Defendants can avoid all the issues raised by Plaintiffs' claims without so much as glancing at any app's content." *Id.*

The district court recognized that "[t]aking such a course of action would no doubt cause dramatic upheaval in Defendants' businesses," and "could cost each Defendant millions if not billions in revenue." *Id.* at 12-13. Nonetheless, because payment processing is not "the *only* option," the court did not view third-party content monitoring as "necessary" to avoid liability. *Id.* The court opined that "[p]erhaps if the termination of their payment processing services would pose an existential threat to Defendants, or if it would prevent Defendants from engaging in their publishing activities, then such termination would not be an acceptable alternative to monitoring." *Id.* But the court determined that "the pleadings do not contain facts supporting those circumstances." *Id.* Accordingly, the court held that "Section 230 does not apply" to Plaintiffs' claims seeking to hold Defendants liable

for processing payments for virtual content in social casino apps. *Id.*

The district court then "turn[ed] to the merits of Plaintiffs' claims." *Id.* at 15. The court granted Defendants' motions to dismiss Plaintiffs' California claims, *id.* at 17, "loss recovery claims" under several States' laws, *id.* at 28, "unjust enrichment claims," *id.* at 31, and "RICO claims," *id.* at 34. In contrast, the court denied Defendants' motions to dismiss Plaintiffs' claims under "Kentucky's loss recovery statute," *id.* at 28, as well as their claims under several States' "consumer protection laws," *id.* at 30.

The district court "sua sponte certifie[d] [its] Order, and its prior order on Section 230, for immediate appeal under 28 U.S.C. § 1292(b)." *Id.* at 34. The court noted that this Court's initial grant of interlocutory review "indicat[es] that the issues involved [are] significant enough to warrant the Circuit's immediate consideration." *Id.* The court also emphasized that "[a]nother court may well have come out differently," particularly because "there is no precedent explaining how to determine" if "monitoring of third-party content was necessary to comply with the duties implicated by Plaintiffs' claims." *Id.* at 35. And the court stated that this Court's current precedent contains "a seeming contradiction" about whether "Section 230 applies when a duty requires monitoring" of third-party content "even if that duty does not spring from a defendant's status or conduct as [a] publisher." *Id.* (citing *Calise*, 103 F.4th at 743; *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107-

1109 (9th Cir. 2009)).

## REASONS THE APPEAL SHOULD BE PERMITTED

The district court's order meets each of Section 1292(b)'s prerequisites: (1) it involves a controlling question of law because a proper interpretation of Section 230 would bar all of Plaintiffs' claims without the need for factual development; (2) there is substantial ground for difference of opinion as to whether Section 230 applies to Plaintiffs' claims; and (3) an immediate appeal will materially advance the ultimate termination of the litigation because, if Defendants are correct, judgment must be entered in their favor. *See* 28 U.S.C. § 1292(b). As the district court also recognized, "[t]his case presents exceptional circumstances" that justify a departure from the usual rule that parties may appeal only after final judgment. Dkt. 80 at 36; *see ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1131 (9th Cir. 2022).

In granting Defendants' first petitions for interlocutory review in this case, this Court already determined that the Section 230 question presented satisfies Section 1292(b). And while the Court ultimately dismissed those petitions for lack of appellate jurisdiction because the district court had not applied its Section 230 analysis to Plaintiffs' claims, the court has now done so and re-certified its order for interlocutory appeal. This Court should again grant interlocutory review and resolve the critical Section 230 question presented.

### A. The Section 230 Defense Is a Controlling Question of Law

Whether Section 230 bars Plaintiffs' claims alleging that Defendants are liable because they processed sales of virtual content is a "controlling question of law." 28 U.S.C. § 1292(b). The question is one of "statutory interpretation," *Calise*, 103 F.4th at 738, that turns on whether Plaintiffs' claims "treat[]" Defendants "as [a] publisher," 47 U.S.C. § 230(c)(1). Answering that question does not depend "on facts from the record." *ICTSI*, 22 F.4th at 1132.

In addition, the legal question is "controlling" because "resolution of the issue on appeal could materially affect the outcome of litigation in the district court." *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982). Indeed, as the district court has twice acknowledged, if this Court were to "reverse[] [the district court's] holding" on Section 230, "the case [would be] resolved in its entirety." Dkt. 80 at 36.

### B. Substantial Ground for Difference of Opinion Exists as to Whether Section 230 Bars Plaintiffs' Claims

A "substantial ground for difference of opinion" also exists as to the proper resolution of the controlling Section 230 issue. 28 U.S.C. § 1292(b). That requirement is met where "novel and difficult questions of first impression are presented" or "where reasonable jurists might disagree on an issue's resolution." *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011) (citation omitted). As the district court recognized, both circumstances are present here. *See*

Dkt. 154 at 35.

This Court's decisions set forth the framework governing "what it means to 'treat[]' an interactive computer service 'as [a] publisher or speaker.'" *Calise*, 103 F.4th at 740 (quoting 47 U.S.C. § 230(c)(1)). Under that framework, Section 230 may bar a claim in two separate circumstances arising from the "legal 'duty'" created by a claim. *Id.* at 742; *see Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 642 (9th Cir. 2025) (recognizing that in any circumstance where the duty "requires the defendant to act as a publisher, immunity applies"). First, if "the 'right' from which the duty springs" is related to "the defendant's status as a publisher," then Section 230 preempts the claim. *Calise*, 103 F.4th at 742. Second, if the duty "obliges the defendant to 'monitor third-party content'—or else face liability—then that too is barred by § 230(c)(1)." *Id.*; *see id.* at 746 (Nelson, J., concurring).

This Court's precedent illustrates what it means for a claim to depend on a content-monitoring obligation. In *Calise*, some of the plaintiffs' claims alleged that Meta had a duty to prevent the "posting [of] fraudulent third-party ads on its website." *Id.* at 743 (majority opinion). Because Meta "would need to actively vet and evaluate third party ads" to "avoid liability" under that duty, this Court held that "§ 230(c)(1) bar[red]" those claims. *Id.* at 744.

Similarly, in *Doe 1*, some of the plaintiffs' claims sought to hold Twitter liable for "alleged third-party abuses of its hashtag and search functions." 148 F.4th at

646. The plaintiffs contended that "Twitter has the ability to, and in fact does, block certain hashtags." *Id.* But this Court held that Section 230 protected Twitter from liability because "[d]istinguishing between innocent . . . hashtags and the more nefarious ones would require Twitter to act as a publisher." *Id.*

By contrast, in *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), platforms hosting short-term home rental listings argued that Section 230 preempted application of a city ordinance barring online services from executing transactions for short-term rentals except for licensed "home-share[s]." *Id.* at 680. The city maintained a registry listing licensed properties. *Id.* This Court held that "a duty to cross-reference bookings against [the city's] property registry" did not entail an obligation "to monitor third-party content" because the platforms did not need "to review the content provided by the hosts of listings on their websites." *Id.* at 682. Instead, they could simply "keep[] track of the city's registry" and "complete a booking transaction" only for properties on the registry. *Id.*

Here, Section 230 bars the claims because they assert duties that would require Defendants "to 'monitor third-party content.'" *Calise*, 103 F.4th at 742. Specifically, Plaintiffs allege that Defendants have a duty to avoid processing sales of certain types of virtual content in certain types of apps when those sales satisfy the criteria for illegal gambling under various state laws. *See* Dkt. 154 at 28 (analyzing Kentucky law duty to return certain gambling losses). But to fulfill that

duty, Defendants would need to "actively vet and evaluate" both the content of the apps in their stores—to discern which apps allow users to play virtual casino games that meet Plaintiffs' definition of a social casino app—and the content of the transactions within those apps—to discern which involve sales of virtual content that allegedly violate state loss-recovery statutes. *Calise*, 103 F.4th at 744. Absent such content monitoring, Defendants would not be able to process payments for in-app transactions. And unlike in *HomeAway*, there is no "registry" of social casino apps, so Defendants cannot simply "cross-reference" the names of apps against an independently maintained list. 918 F.3d at 682. Instead, they would have to "review the content provided" by the apps on their platforms—a requirement that *HomeAway* acknowledges would trigger Section 230 immunity. *Id.; accord Doe 1*, 148 F.4th at 642.

2. The district court's contrary holding is incorrect. The court agreed that "[t]he only way [Defendants] can determine if they may or may not process a payment transaction is to cross-reference that transaction against the app it originated in." Dkt. 154 at 12. And the court did not doubt that such an act would entail "monitor[ing of] third-party content." *HomeAway*, 918 F.3d at 682. Yet the court concluded that such monitoring is not "necessary" because Defendants could simply "choose to stop offering their own payment processing and allow app developers to use the services of dedicated third-party processors." Dkt. 154 at 12.

In the court's view, the theoretical availability of that option—which the court recognized "could cost each Defendant millions if not billions in revenue"—precluded Section 230 immunity. *Id.* at 13. So long as that "course of action" would not pose "an existential threat" to Defendants' businesses, the court deemed it "an acceptable alternative to monitoring." *Id.* at 12-13.

The district court cited no meaningful support for its theory that third-party content monitoring is not "necessary" so long as an online platform has the alternative option of fundamentally restructuring its business. *Id.* at 12. And in fact, *Calise* refutes that theory. As already explained, the Court there held that Section 230 immunity attached because the duty implicated by certain claims would have required Meta "to actively vet and evaluate third party ads." 103 F.4th at 744. In so holding, the Court did not ask whether Meta could have avoided that duty by simply choosing to stop selling third-party ads altogether. And no part of *Calise* factored in the revenue loss and its impact on Meta's overall business.

That is for good reason. The district court's theory would require courts to distinguish between actions that would "cause dramatic upheaval in [an online platform's] business[]"—which are apparently "acceptable alternative[s] to monitoring"—and actions that would "pose an existential threat" to a platform's business—which are "[p]erhaps" not acceptable alternatives. Dkt. 154 at 12-13. But nothing in Section 230's text supports such a distinction. And courts are ill-equipped

to perform such an amorphous line-drawing exercise—particularly one that depends heavily on the practical realities of a defendant's business. Thus, the proper question is whether, in light of plaintiffs' allegations about an online service's current business structure, the relevant duty would "require[] the defendant to act as a publisher," *Doe 1*, 148 F.4th at 642, or "oblige[] the defendant to 'monitor third-party content'—or else face liability," *Calise*, 103 F.4th at 742; *see Doe 1*, 148 F.4th at 643 (holding that a duty would require Twitter to act as a publisher while taking "Twitter's advertising structure and other revenue-generating activities" as a given).

The district court's theory also contravenes Section 230's design. In enacting Section 230, Congress sought "to promote the development of e-commerce," *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003), and to ensure a "vibrant and competitive free market" for the internet, 47 U.S.C. § 230(b)(2). Yet the district court's order would force online platforms to either "stop offering their own payment processing," Dkt. 154 at 12—through which they generate substantial revenue—or else face a flood of class-action lawsuits and sweeping potential liability. Congress enacted Section 230 to ensure that online services would not be placed in that untenable position.

3. At the very least, "reasonable jurists might disagree" about the merits of the district court's holding. *Reese*, 643 F.3d at 688. In certifying its order for interlocutory appeal, the district court specifically recognized that "[a]nother court

may well have come out differently," especially because "there is no precedent explaining how to determine" precisely when "monitoring of third-party content" is "necessary to comply with the duties implicated by Plaintiffs' claims." Dkt. 154 at 35. Where, as here, "novel and difficult questions of first impression are presented," courts "traditionally will find that a substantial ground for difference of opinion exists." *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010).

The district court's order is also in tension with cases in which "[c]ourts have granted [Section 230] protection to websites that process payments and transactions in connection with third-party listings." *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d 1097, 1106 (C.D. Cal. 2017) (collecting cases). In *Coffee v. Google, LLC*, No. 20-cv-03901, 2022 WL 94986 (N.D. Cal. Jan. 10, 2022), for example, the court held that Section 230 barred claims "based on Google's revenue sharing with respect to sales of virtual currency." *Id.* at *6. And in *YZ Productions, Inc. v. Redbubble, Inc.*, 545 F. Supp. 3d 756 (N.D. Cal. 2021), the court held that Section 230 protected an e-commerce marketplace when processing the sale of allegedly infringing website designs, even though the marketplace "pocket[ed] a significant portion of profits." *Id.* at 769. By contrast, under the district court's logic here, Section 230 would *not* shield an online service from liability for processing allegedly unlawful sales of virtual content so long as the company could theoretically exit the business of payment processing altogether. The conflict between district courts

confirms that "reasonable jurists might disagree" about the question presented. *Reese*, 643 F.3d at 688.

### C. Interlocutory Review Would Materially Advance Termination of the Litigation

An immediate appeal of the district court's order "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). There need not be "a final, dispositive effect on the litigation," so long as an appeal could move the ball forward on at least some claims. *Reese*, 643 F.3d at 688. But an immediate appeal has the potential to accomplish much more in this case. Indeed, as noted above, a reversal by this Court would "resolve[]" the case "in its entirety" and require entry of judgment for Defendants. Dkt. 80 at 36.

### D. This Court Should Exercise Its Discretion to Grant Interlocutory Review

Finally, even when an order meets Section 1292(b)'s requirements, this Court "enjoys broad discretion" over whether to entertain the interlocutory appeal. *ICTSI*, 22 F.4th at 1131. The Court should exercise that discretion to grant interlocutory review here.

As an initial matter, interlocutory review may potentially "avoid protracted and expensive litigation." *In re Cement*, 673 F.2d at 1026. This case involves sprawling multidistrict and class-action litigation based on numerous claims under various state and federal laws. If this Court were to reverse the district court's order

and hold that Section 230 bars Plaintiffs' claims, then that ruling would "appreciably shorten the time, effort, [and] expense of conducting [this] lawsuit." *Id.* at 1027.

That interest in efficiency is particularly compelling given Section 230's status as "an immunity statute." *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) (en banc). Congress enacted Section 230 "to protect websites not merely from ultimate liability, but from having to fight costly and protracted legal battles." *Id.* at 1175. This Court has accordingly granted Section 1292(b) review of orders rejecting Section 230 immunity—as it did before in this very case. *See In re Facebook*, Dkt. 97-1 at 4; *see also Doe #1 v. Twitter, Inc.*, No. 22-15103, 2023 WL 3220912, at *1 (9th Cir. May 3, 2023).

The question presented by this petition also carries widespread importance beyond the parties in this case. Many online services in addition to Google, Meta, and Apple facilitate access to third-party content for a fee. Consider, for instance, companies that process subscriptions for podcasts or newsletters produced by third parties. If allowed to stand, the district court's order may invite lawsuits against such platforms claiming that they processed sales of allegedly "unlawful" content. That result would contravene Congress's judgment that online services should not be held liable for failing to engage in the "impossible" task of "screen[ing]" voluminous amounts of third-party content "for possible problems." *Carafano v.*

*Metrosplash.com, Inc.*, 339 F.3d 1119, 1124 (9th Cir. 2003) (citation omitted). This Court should grant review to vindicate Section 230's vital protections.

## RELIEF SOUGHT

Google and Meta respectfully request that the Court grant their petition for permission to appeal under 28 U.S.C. § 1292(b).

Dated: October 10, 2025

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*

Elizabeth B. Prelogar
Ephraim A. McDowell
Cooley LLP
1299 Pennsylvania Ave. NW
Washington, DC 20004
(202) 776-2115
eprelogar@cooley.com

Teresa H. Michaud
Cooley LLP
355 S. Grand Avenue, Ste. 900
Los Angeles, CA 90071
(213) 561-3241

Brian M. Willen
Wilson Sonsini Goodrich & Rosati, P.C.
1301 Sixth Ave, 40th Floor
New York, NY 10019
(212) 999-5800

Lauren Gallo White
Wilson Sonsini Goodrich & Rosati, P.C.
One Market Plaza, Suite 3300
San Francisco, CA 94105
(415) 947-2000

*Counsel for Defendants-Petitioners Google LLC and Google Payment Corp.*

Theodore J. Boutrous, Jr.
Christopher Chorba
Timothy Loose
Patrick J. Fuster
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
(213) 229-7000
tboutrous@gibsondunn.com

*Counsel for Defendant-Petitioner Meta Platforms, Inc.*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this Petition complies with the type-volume limitation of Circuit Rules 5-2(b) and 32-3(2) because it contains 5,361 words, excluding the parts of the Petition exempted by Federal Rules of Appellate Procedure 5(b)(1)(E) and 32(f).

This Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 2016, Times New Roman 14-point font.

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Defendants-Petitioners*
*Google LLC and Google Payment Corp.*

# CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Court's Appellate Electronic Filing system. I further certify that I served the foregoing on this date by a third-party carrier for delivery within three calendar days to the below-listed counsel and by courtesy copies via email on this same date.

Rafey S. Balabanian, Esq.
rbalabanian@edelson.com
Todd Logan, Esq.
tlogan@edelson.com
Brandt Silver-Korn, Esq.
bsilverkorn@edelson.com
**EDELSON PC**
150 California Street, 18th Floor
San Francisco, CA 94111
Tel: (415) 212-9300
Fax: (415) 373-9435

*Counsel for Plaintiffs-Respondents*

John Samuel Gibson
john.gibson@us.dlapiper.com
**DLA PIPER LLP (US)**
20000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
Tel: (310) 595-3039
Fax: (310) 595-3339

*Counsel for Defendant Apple Inc.*

Date: October 10, 2025

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Defendants-Petitioners Google LLC and Google Payment Corp.*

# APPENDIX

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-02985-EJD<br>**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS; CERTIFYING INTERLOCUTORY APPEAL**<br>Re: ECF No. 145 |
| IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-03001-EJD<br>Re: ECF No. 125 |
| IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-cv-02777-EJD<br>Re: ECF No. 158 |

In these three putative class actions, plaintiffs from around the country seek to hold Defendants Apple Inc., Google LLC, and Meta Platforms, Inc.[1] liable for supporting social casino apps. Plaintiffs argue that these apps constitute illegal gambling. As such, Plaintiffs claim that Defendants are violating several states' laws, as well as the federal Racketeer Influenced and

[1] Plaintiffs name Facebook, Inc. as the defendant in their complaint even though Facebook has changed its name to Meta Platforms, Inc., and the parties refer to the company as Meta throughout their briefs. The Court therefore refers to the company as Meta.

United States District Court
Northern District of California

Corrupt Organizations Act (RICO), by offering payment processing services to the social casino apps' developers. Each Defendant moved to dismiss for failure to state a claim. After careful consideration of the parties' written submissions and oral arguments, the Court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss.

## I. BACKGROUND

### A. Factual Allegations[2]

Over the past two decades, smartphones have grown to become a ubiquitous feature of modern society. So too have mobile apps, which now generate billions of dollars in revenue each year. These matters concern one category of mobile apps: social casinos.

Social casinos are apps that mimic the experience of playing slot machines at physical casinos. Apple Compl. ¶¶ 2, 58, ECF No. 144. To play, users wager virtual chips on simulated slot machine spins. *Id.* ¶¶ 3, 59. If a user wins, she receives more virtual chips. If she loses, she forfeits all the virtual chips she wagered. *Id.* ¶¶ 3, 60. When users first access a social casino, they receive an initial allowance of virtual chips. They can also receive more free chips by waiting for a period of time set by the social casino. *Id.* ¶¶ 60, 62. However, these free virtual chips run out quickly. *Id.* ¶ 66. At that point, users who wish to continue playing immediately must purchase more chips with actual currency. *Id.* ¶¶ 3, 62. Once users purchase those chips, there is no way to get their money back; social casinos offer no method for cashing out virtual chips, and chips can only be used to spin simulated slots within the casino apps. *Id.* ¶ 3.

According to Plaintiffs, these social casinos have had devastating impacts on many users. Users who become addicted to these casino apps may face depression, strained relationships, or other emotional distress. *Id.* ¶¶ 106–08. For some, their relentless spending on virtual chips forces them to skip medical treatments or even meals due to lack of money. *Id.* One Plaintiff

[2] Because the material factual allegations in each case are not substantially different with respect to the issues discussed in this Order, the Court generally cites to the Apple (Case No. 5:21-md-02985) docket for ease of reference, rather than the Google (Case No. 5:21-md-3001) or Meta (Case no. 5:21-cv-2777) dockets. To identify which docket it is citing to, the Court either includes "Apple," "Google," or "Meta" in the name of the cited document or appends it parenthetically to the end of the record citation.

estimates spending $220,000 on social casinos, which has forced him to twice leverage his home equity to pay off credit card debt. *Id.* ¶ 109. Another Plaintiff estimates spending $30,000 on social casinos, causing her to miss deadlines for rent, car payments, and other household bills. *Id.* ¶ 111. And several have reported spending thirty or more hours per week on social casinos. *Id.* ¶¶ 109, 113, 117, 124, 126–27.

This is purportedly no accident. Plaintiffs allege that developers design social casinos specifically to create and exploit addicted users. *Id.* ¶¶ 4, 9. For example, social casino developers have patented "dynamic paytables" that vary the payout of simulated slot machines based on the time a user has spent on a casino app. *Id.* ¶ 68. Such developers use these dynamic paytables in their apps because, in one developer's own words, "players are more apt to play gaming machines for longer periods of time if the payout is increased as the player continues to play the game." *Id.* ¶ 69. That is, developers seek to maximize both the time and money that users spend on casino apps. *Id.* ¶ 71.

Plaintiffs believe it is not just social casino app developers who are responsible for this situation. Plaintiffs assert that Defendants, too, share blame. As Plaintiffs explain, each Defendant operates an app store through which social casinos are available for download. *Id.* ¶¶ 50, 55; Google Compl. ¶¶ 47, 53, ECF No. 124; Meta Compl. ¶¶ 48, 53, ECF No. 157. Each Defendant also requires apps downloaded from their respective stores to use their respective payment processing system for in-app purchases. Each Defendant then takes a thirty percent cut of every in-app transaction. Apple Compl. ¶ 95; Google Compl. ¶ 92; Meta Compl. ¶ 89. Whenever Defendants process a virtual chip purchase in a social casino, say Plaintiffs, they are contributing to the problem by unlawfully facilitating illegal gambling transactions.

### B. Procedural History

This is the second time Defendants have sought to dismiss the claims in these actions. Defendants first moved to dismiss all claims back in 2022, arguing that they were immune from Plaintiffs' claims under Section 230 of the Communications Decency Act, 47 U.S.C. § 230. *See* ECF No. 92 (Apple). In addressing Defendants' first set of motions to dismiss, the parties and the Court focused on three theories of liability based on three different aspects of Defendants'

conduct: (1) promotion of social casino apps in their app stores (the promotion theory); (2) processing of in-app transactions for virtual chips (the payment processing theory); and (3) providing support to casino app developers for driving increased user engagement and revenue (the business support theory). Prior Order 31–32, ECF No. 106 (Apple). The Court ultimately ruled that Section 230 barred the promotion and business support theories but not the payment processing theory. *Id.* at 32–35.

The Court also certified its order on those motions for interlocutory appeal under 28 U.S.C. § 1292(b). *Id.* at 35–36. A motions panel of the Ninth Circuit initially granted permission to appeal. *See* Appeal Order, Case No. 22-80099 (9th Cir.), ECF No. 11. But upon further consideration by the merits panel, the Ninth Circuit dismissed the appeal. USCA Mem., ECF No. 119 (Apple). The merits panel held that, for the Circuit to have interlocutory jurisdiction under § 1292(b), the Court would have needed to dismiss (or deny dismissal of) specific claims. Because the Court's order addressed theories, not claims, the Circuit lacked jurisdiction. *Id.*

After the Court certified its order for interlocutory appeal, the Court stayed these matters pending the Ninth Circuit's decision on whether to grant permission to appeal. Prior Order 36. The Court did not officially extend the stay after the motions panel granted permission to appeal, but a de facto stay continued to hold while the appeal was pending—no substantive activity occurred on the docket during that period. *See* ECF Nos. 106–19 (Apple); ECF Nos. 80–98 (Google); ECF Nos. 119–31 (Meta). It was not until the merits panel dismissed the appeal that the litigation before this Court became active again.

Each Defendant separately moved to dismiss a second time, although they incorporated and joined in each other's arguments. Apple MTD, ECF No. 145; Google MTD, ECF No. 125; Meta MTD, ECF No. 158. In their motions, Defendants again sought to invoke Section 230 immunity as to the surviving payment processing theory, arguing that intervening circuit precedent should change the Court's earlier analysis. Defendants also sought to dismiss most of Plaintiffs' state law claims, which they grouped into three categories: gambling loss recovery statutes, consumer protection laws, and unjust enrichment. Finally, Defendants sought to dismiss the RICO claim as well. Plaintiffs filed a single omnibus opposition to all three motions. Opp'n, ECF

No. 151 (Apple). Defendants filed separate replies. Apple Reply, ECF No. 153; Google Reply, ECF No. 133; Meta Reply, ECF No. 164.

**II. REQUESTS FOR JUDICIAL NOTICE**

Before turning to Defendants' motions to dismiss, the Court begins by addressing their requests for the Court to consider materials outside the complaints. Courts usually may not consider such materials at the pleading stage. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). The only exceptions to this rule are judicial notice and incorporation by reference. *Id.* Judicial notice permits courts to consider facts that are not subject to reasonable dispute. *Id.* at 999 (quoting Fed. R. Evid. 201). Courts may judicially notice the existence of public records but not disputed facts in those records. *Id.* Incorporation by reference allows courts to "treat[] certain documents as though they are part of the complaint itself." *Id.* at 1002. This doctrine applies when a document forms the basis of a plaintiff's claim, or that document is cited extensively in the complaint. *Id.*

Apple and Google ask the Court to consider five documents under these exceptions. Apple RJN, ECF No. 146; Google RJN, ECF No. 125-4. Apple requests judicial notice of its licensing agreement, two of its policy documents for app developers, and a copy of one app's page from the Apple App Store. Apple RJN at 1–2. Google seeks judicial notice of one social casino app developer's terms of use. Google RJN. As these documents are all publicly available and Plaintiffs do not contest their authenticity or their existence, the Court takes judicial notice of each of these documents. *Khoja*, 899 F.3d at 999; Fed. R. Evid. 201(b)(2); RJN Resp., ECF No. 150 (Apple). The Court takes notice of these documents for their existence, not for the truth of any facts contained in them. *Khoja*, 899 F.3d at 999.

Apple asks for more with respect to its licensing agreement and one of its policy documents. For those, Apple requests incorporation by reference in addition to judicial notice. Apple RJN at 2–4. That way, the Court may go beyond acknowledging those documents' existence and also assume that the contents of those documents are true. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). *But see Khoja*, 899 F.3d at 1003 ("[I]t is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a

well-pleaded complaint."). In these circumstances, the Court need not decide whether it may properly assume the truth of these two documents because they are not subject to incorporation by reference.

First, they do not form the basis of Plaintiffs' claims. Plaintiffs do not allege that Apple violated its own policies or licensing agreements. Although the documents touch on topics related to Plaintiffs' claims, that shows only that the documents may be relevant evidence, not that they are the basis of Plaintiffs' claims. If relevance were enough, incorporation by reference would not be a narrow exception to the rule that courts are limited to the pleadings. It would become a gaping hole through which defendants could freely introduce evidence at the pleading stage.

Second, the documents that Apple seeks to incorporate are not cited extensively in the complaint. To qualify under this test, "the complaint must cite the document at least more than once or quote from it at length; merely mentioning the existence of a document is insufficient." *Callen v. Resonant Inc.*, 709 F. Supp. 3d 1021, 1025 (C.D. Cal. 2023) (citing *Khoja*, 899 F.3d at 1002–04). Here, Plaintiffs did no more than mention the two documents in their complaint. The complaint twice cites to the licensing agreement without quoting from it. Apple Compl. ¶¶ 63 n.8, 76 n.14. And it cites just once to the policy document sought to be incorporated, again without quotation. *Id.* ¶ 82 n.16. Those scarce references do not support incorporation by reference.

## III. MOTIONS TO DISMISS

### A. Legal Standard

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For a claim to be plausible, the complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim clears the plausibility bar when its factual allegations support a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Merely reciting the elements of a claim through conclusory allegations is not sufficient. *Id.*

United States District Court
Northern District of California

In assessing whether a complaint satisfies this standard, courts accept all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Retail Prop. Tr. v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). That said, courts do not credit "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

**B. Section 230**

The Court starts with Defendants' Section 230 arguments. When Congress enacted the Communications Decency Act in 1996, one of its goals was "to promote the free exchange of information and ideas over the Internet and to encourage voluntary monitoring for offensive or obscene material." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003). In service of this goal, Congress wrote Section 230 into the Act, directing that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In doing so, Congress "immunize[d] providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) (footnote omitted).

In the years since, courts have interpreted Section 230 to offer "sweeping," albeit "not limitless," immunity. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 739 (9th Cir. 2024) (citation omitted). Even though *Roommates* seemingly speaks of immunity for all liability arising from third-party content, the Ninth Circuit has clarified that Section 230 immunity does not attach whenever third-party content is a "but for" cause of liability. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (citing *Doe v. Internet Brands*, 824 F.3d 846, 853 (9th Cir. 2016)); *see also Doe 1 v. Twitter, Inc.*, 148 F.4th 635, 642 (9th Cir. 2025). Rather, courts use a three-prong test to determine if Section 230 immunity applies. A defendant is immune if it is "(1) a provider or user of an interactive computer service, (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker, (3) of information provided by another information content provider." *Id.* at 738 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009)). Plaintiffs do not dispute that the first and third prongs of this test are met, so

United States District Court
Northern District of California

only the second prong is at issue. Opp'n at 6; *see also* Google Mot. at 5 & n.2 (arguing that only prong two is at issue and that prongs one and three are satisfied).

This is now the second time that the Court is addressing the issue even though the material allegations have not changed. *See* ECF No. 144-3 (Apple). However, Defendants represented that the landscape of Section 230 precedent shifted while these matters were up on appeal. ECF No. 129 (Apple). Based largely on this representation, the Court allowed Defendants to re-raise Section 230 arguments in this round of motion briefing. Defendants primarily assert that the Ninth Circuit's most recent foray into the second prong, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024), shows that the payment processing theory fails under Section 230. In addition, Defendants raise a litany of other arguments that they spend significantly less time on. The Court first tacklers *Calise* before briefly discussing Defendants' remaining arguments on Section 230.

**1. *Calise v. Meta Platforms, Inc.***

In the leadup to *Calise*, it was already well established that courts looked to the legal duties implicated by a claim when assessing whether a defendant was being treated as a publisher or speaker under prong two. *Barnes*, 570 F.3d at 1102. *Calise* aimed to refine that approach, explaining that the duty analysis requires courts to examine both the source and the substance of the duties involved. *Calise*, 103 F.4th at 742. Specifically, *Calise* held that courts must ask two questions when assessing duty:

> First, what is the "right" from which the duty springs? If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then § 230(c)(1) does not apply. Second, we ask what is this duty requiring the defendant to do? If it obliges the defendant to "monitor third-party content"—or else face liability—then that too is barred by § 230(c)(1).

*Id.* (citations omitted).

As the Ninth Circuit has interpreted *Calise*'s holding, the source and substance portions of this analysis appear to operate disjunctively. *But see infra* Section IV. Put differently, the second prong is satisfied *either* when a duty springs from status or conduct as a publisher *or* that duty compels monitoring. *Twitter*, 148 F.4th at 642; *see also id.* at 640 ("A claim that obliges the

United States District Court
Northern District of California

defendant to monitor third-party content . . . *also* treats the defendant as a publisher.") (citation modified); *Calise*, 103 F.4th at 746 (R. Nelson, J., concurring) (interpreting the *Calise* panel opinion—authored by Judge R. Nelson himself—to hold that the second prong is satisfied whenever a duty compels monitoring regardless of where the duty originated).

**a. Source of Duties**

When assessing the source of a duty, courts analyze whether that duty "derives from the defendant's status or conduct as a 'publisher or speaker.'" *Barnes*, 570 F.3d at 1102. Like in virtually all Section 230 cases, the "publisher" aspect of this inquiry is at the heart of Defendants' asserted immunity. Although Section 230 does not define "publisher," the Ninth Circuit has held that a party acts as a publisher when it "reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it." *Id.*; *see also HomeAway*, 918 F.3d at 681; *Twitter*, 148 F.4th at 640. A party also acts as a publisher when it facilitates communication between third parties. *Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) (citing *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019)).

Both status as a publisher and conduct as a publisher matter when it comes to Section 230. Status turns on the "capacity" in which a defendant is sued. *Calise*, 103 F.4th at 743 (citing *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021)). This most often arises in the context of claims for products liability and negligent design. Such claims seek to hold a defendant liable in "its distinct capacity as a product designer," not as a publisher, at least when the product feature being challenged is not a publishing feature. *Lemmon*, 995 F.3d at 992 (challenge to a product feature that allegedly incentivized users to travel at dangerously high speeds was not barred). *But see Grindr*, 128 F.4th at 1153 (products liability challenge to a publishing feature treats the defendant as a publisher); *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1180 (9th Cir. 2024) (same), *cert. denied*, 145 S. Ct. 1435 (2025). Status also arises in cases that sound in contract; Section 230 does not apply there because defendants are sued in their capacity as a contractual counterparty or promisor. *Calise*, 103 F.4th at 742 (citing *Barnes*, 570 F.3d at 1107).

Conduct is more complicated, at least when it comes to common law causes of action. For statutory claims, the test is simple. Statutes treat defendants as publishers whenever they prohibit

publishing conduct. Following this logic, the Ninth Circuit held that Section 230 barred a California Unfair Competition Law claim because the duty that it created "to not engage in unfair competition by advertising illegal conduct" was one that "touche[d] on quintessential publishing conduct." *Calise*, 103 F.4th at 744. Common law claims are trickier because Section 230 immunity does not apply every time publishing conduct is involved. *See HomeAway*, 918 F.3d at 682. For Section 230 immunity to attach to a claim, the publishing conduct at issue must *create* the duty underlying that claim. It is easiest to understand this rule by way of example.

Consider negligent undertaking. *Barnes*, 570 F.3d at 1102–03. A negligent undertaking claim imposes a duty to "exercise reasonable care to perform [the] undertaking." *Id.* at 1102 (quoting Restatement (Second) of Torts § 323). That duty does not exist unless the defendant first "undertakes *to do* something." *Id.* at 1103. In other words, the undertaking itself creates and is the source of the relevant duty. Thus, when the undertaking is an act of publishing, like efforts "to de-publish [] offensive profiles," the duty derives from publishing conduct and Section 230 bars liability. *Id.* Unjust enrichment claims are similar. The duty involved in such claims is to return an unjust benefit, so the act of receiving an unjust benefit is the source of the duty. *Calise*, 103 F.4th at 743. When an act of publishing, like the decision to "permit[] third parties to advertise on [a defendant's] website," is the source of that unjust benefit, that act of publishing is also the source of the duty. *Id.* As a result, Section 230 bars those claims, too. *Id.* at 744.

Courts have reached the opposite conclusion when it comes to claims that are contractual or promissory in nature. For instance, a defendant could face a promissory estoppel claim for promising but failing to "de-publish [] offensive profiles." *Barnes*, 570 F.3d at 1103. While Section 230 bars a negligent undertaking claim based on the failure to perform that action, it does not bar a promissory estoppel claim based on the same. *Id.* at 1103, 1107. In a promissory estoppel claim, the defendant's legal duty is to carry out a promise. *Id.* at 1107. The promise, not the publishing activity, is the source of duty in such claims. *Id.* Thus, even when a defendant promises to perform "quintessential publisher conduct," Section 230 does not bar claims to enforce that promise. *Id.*; *see also Calise*, 103 F.4th at 102–03 (same for contract claims where a defendant allegedly contracts to perform a publishing function). Likewise, claims for fraud and

misrepresentation stem from a defendant's allegedly false statement, not from any publishing activity that the defendant did or did not perform. *Est. of Bride*, 112 F.4th at 1178–79. So those claims are not barred by Section 230 either.

To be clear, even though the above discussion suggests that status and conduct are two different issues, they are simply two perspectives on the same question. As the treatment of contract claims demonstrates, both perspectives lead to the same result. The justification for not subjecting contract claims to Section 230 immunity can be thought of in terms of status (such claims treat defendants as contractual counterparties rather than publishers) or conduct (the duty arises from the making of a promise rather than an act of publishing). *Barnes*, 570 F.3d at 1107. What matters in the end is where the relevant legal duty comes from.

With that understanding, the Court concludes that none of the Plaintiffs' claims invoke duties that derive from Defendants' status or conduct as a publisher. The crux of the statutory claims in these cases is that Defendants were prohibited from processing in-app payments for social casino apps. *E.g.*, Apple Compl. ¶¶ 188, 200, 540. Payment processing is not an act of publishing. It is a transaction, one that is "distinct, internal, and nonpublic." *HomeAway*, 918 F.3d at 682. Of course, payment processing activities may be an important part of publishing activity. But that does not make payment processing a publishing activity. Instead, it is better viewed as a generic business activity common to virtually all companies, publishers or not, just like hiring workers or paying taxes. None of those activities, including payment processing, are acts of "reviewing, editing, [or] deciding whether to publish or withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102. Limits on Defendants' ability to process certain payments does not interfere with Defendants' ability to publish third-party apps by offering them in their app stores or by making in-app content available. One can understand this point by recognizing that the duties imposed by these statutes apply equally to dedicated payment processors such as PayPal, Square, and Stripe even though those companies are plainly not publishers. A duty that applies equally to non-publishers does not treat a defendant as a publisher.

The discussion of Plaintiffs' statutory claims also resolves the source-of-duty issue as to their unjust enrichment claims. Plaintiffs allege that Defendants unjustly benefited by taking a

thirty percent commission when processing in-app transactions for social casino apps. *E.g.*, Apple Compl. ¶¶ 95, 207. Since payment processing is not a publishing activity, the source of the duties in these unjust enrichment claims is not publishing conduct, and the duty implicated by such claims does not derive from publishing. *See Calise*, 103 F.4th at 743–44.

Consequently, the source of the duties implicated by Plaintiffs' claims is not status or conduct as a publisher.

**b. Substance of Duties**

Since the source of Defendants' duties does not derive from their status or conduct as publisher, the last remaining way for Defendants to satisfy *Calise*'s test is to show that those duties require monitoring of third-party content. *Calise*, 103 F.4th at 742. Section 230 does not apply every time that a company "might" respond to a legal duty with monitoring. *HomeAway*, 918 F.3d at 682. The duty must "necessarily" require monitoring to trigger Section 230. *Id.* Defendants insist that monitoring is necessary because there is no independently maintained list of social casino apps. The only way they can determine if they may or may not process a payment transaction is to cross-reference that transaction against the app it originated in.

That may be correct so far as Defendants intend to continue offering their own payment processing services. But as Plaintiffs point out, Defendants need not do so. Defendants can choose to stop offering their own payment processing and allow app developers to use the services of dedicated third-party processors. In this way, Defendants can avoid all the issues raised by Plaintiffs' claims without so much as glancing at any app's content. Put differently, Plaintiffs' claims are "not directed to [] third-party content" because any "alleged violation . . . could be remedied without [referencing] any of the content posted by [third-parties]." *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021) *vacated on other grounds*, 598 U.S. 617 (2023).[3]

Taking such a course of action would no doubt cause dramatic upheaval in Defendants' businesses. Each Defendant takes a thirty percent commission on all in-app transactions that they

[3] Vacated opinions remain persuasive even though they are no longer binding. *Doe I v. Cisco Sys., Inc.*, 73 F.4th 700, 717 n.10 (9th Cir. 2023) (quoting *Spears v. Stewart*, 283 F.3d 992, 1017 n.16 (9th Cir. 2002)). The Court therefore cites to *Gonzalez* solely as persuasive authority.



United States District Court
Northern District of California

United States District Court
Northern District of California

process. Apple Compl. ¶ 95; Google Compl. ¶ 92; Meta Compl. ¶ 89. Given how big the app industry has grown, relinquishing this commission by halting app processing services could cost each Defendant millions if not billions in revenue. But monitoring does not become necessary just because it "would be the best option from a business standpoint" or would be the "most practical compliance option." *HomeAway*, 918 F.3d at 683. Monitoring is not necessary unless it is "the *only* option." *Est. of Bride*, 112 F.4th at 1177 n.3 (emphasis added). Perhaps if the termination of their payment processing services would pose an existential threat to Defendants, or if it would prevent Defendants from engaging in their publishing activities, then such termination would not be an acceptable alternative to monitoring. At this stage, though, the Court need not determine if monitoring would be necessary under those circumstances since the pleadings do not contain facts supporting those circumstances. *See Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 815 (N.D. Cal. 2024) (Section 230 is an affirmative defense that does not compel dismissal at the pleading stage unless "the plaintiff pleads itself out of court") (quoting *Durnford v. MuschlPharm Corp.*, 907 F.3d 595, 604 (9th Cir. 2018)).

For these reasons, monitoring is not necessary based on the facts alleged in the pleadings, and Section 230 does not apply under *Calise*.

**2. Other Arguments**

None of Defendants' remaining arguments justify dismissal on Section 230 grounds.

***First***, Defendants suggest that Section 230 protects them because they provide "neutral tools" to social casino apps. True, but irrelevant. While the Ninth Circuit has recognized a neutral tools analysis for Section 230, it has consistently situated that analysis under the third prong of the immunity test—whether content is provided by a third party. *Calise*, 103 F.4th at 745–46; *Dryoff*, 934 F.3d at 1098–99. This is because the neutral tools analysis informs whether the defendant is a "creator or developer" of content, *i.e.*, whether the content is the defendant's or another's. *Lemmon*, 995 F.3d at 1094; *see also Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016) (tying neutral tools analysis to the issue of "content development or creation").

In trying to argue otherwise, Defendants point to *Grindr*, 128 F.4th at 1153, which in their reading treated neutral tools analysis as a part of the second prong of Section 230. But *Grindr* did

United States District Court
Northern District of California

not attempt to separate its analysis by Section 230 prongs. And when it discussed neutral tools analysis, *Grindr* cited those portions of *Dryoff* addressing the third prong. *Id.* (citing *Dryoff*, 934 F.3d at 1098). In any case, *Grindr* held that Section 230 applied because "the challenged features of [Grindr's] App are not independent of Grindr's role as a facilitator and publisher of third-party content." *Id.* at 1153. Here, by contrast, payment processing is independent of Defendants' ability to publish third-party apps; Defendants can publish apps without offering payment processing services themselves. So, the fact that Defendants' payment processing services are neutral tools does not satisfy the second prong of Section 230 immunity.

***Second***, Defendants fault Plaintiffs for failing to plead their operative theory of liability in their complaints because Plaintiffs supposedly failed to plead that Defendants are "bookies" or "brokers." Maybe so, but the crux of Plaintiffs' theory is that Defendants improperly processed payments for social casino apps. As long as Plaintiffs have alleged that Defendants process payments for social casino apps, it is beside the point whether that activity turns Defendants into bookies or brokers. Plaintiffs have alleged that much. Apple Compl. ¶ 95; Google Compl. ¶ 92; Meta Compl. ¶ 89.

***Third***, Defendants claim that Plaintiffs conceded the game on interlocutory appeal when they admitted that Defendants engaged in publishing activity by offering apps on their app stores. This argument appears to invoke the doctrine of judicial estoppel, which prevents a party from changing positions after a "court relied on, or accepted, the party's previous inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782–83 (9th Cir. 2001) (citation and internal quotation marks omitted). The Ninth Circuit never relied on Plaintiffs' purported admission because it dismissed the appeal for lack of jurisdiction without addressing the merits. *See* USCA Mem. Regardless, as the Court has repeatedly discussed throughout this Section, payment processing is separate from the publication of apps on app stores.

***Fourth***, Defendants emphasize that Plaintiffs' claims must be barred because Plaintiffs have failed to allege Defendants' "own bad acts." Apple Reply at 4–6. These are merits arguments and do not bear on the Section 230 analysis. *See also* Google Mot. At 11–19 (making merits arguments under the heading of Section 230). Plaintiffs may well have failed to plead that

Defendants have violated any asserted duty, but that does not mean Section 230 prevents Plaintiffs from asserting these duties against Defendants in the first place.

***Finally***, Defendants argue that the Court must construe Section 230 to provide immunity in these circumstances as a matter of constitutional avoidance. They have not done much to develop this point, but presumably they believe that Plaintiffs' claims raise free speech concerns under the First Amendment. That much is far from obvious as there are many questions that Defendants do not even attempt to address, including basic questions about whether Plaintiffs' claims implicate speech in the first place, or if the claims are better viewed as being directed to conduct. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) ("[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."). More fundamentally, the constitutionality of Plaintiffs' claims has no bearing on the application of constitutional avoidance to Section 230. Constitutional avoidance instructs courts to avoid interpreting an ambiguous statute in ways that would render it unconstitutional or questionably constitutional. *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 237–38 (1998)). The statute that Defendants ask the Court to construe is Section 230, not the statutes underlying Plaintiffs' claims. And the Court knows of no authority, nor have Defendants provided any authority, holding that a federal statute is unconstitutional because it does not immunize defendants from state laws or claims of questionable constitutionality.

Section 230 therefore does not render Defendants immune from Plaintiffs' claims.

### C. California Claims

The Court now turns to the merits of Plaintiffs' claims, starting with their claims under California law for unjust enrichment and violation of the Unfair Competition Law (UCL). Both claims are premised on the theory that Defendants processed illegal gambling transactions for social casinos, so both are barred by California's public policy against judicial resolution of gambling-related claims. *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 477 (1999).

California's policy against gambling-related claims has a long pedigree. It "can be traced back virtually to the inception of statehood." *Id.* In one sense, it stretches even further back

because California adopted the policy from English common law. *Tak Chun Gaming Promotion Co. Ltd. v. Long*, 96 Cal. App. 5th 1027, 1032–33. California courts have consistently and repeatedly affirmed this policy. Since the policy's creation, the California Supreme Court "has issued a long line of unbroken decisions" reaffirming the policy, and "[w]ith one exception, [California's] intermediate appellate courts have all uniformly toed that line" too. *Id.* (collecting cases); *see also Kelly*, 72 Cal. App. 4th at 477–88 (tracing the judicial history of the policy through California courts). In fact, the California Court of Appeal has reaffirmed this policy as recently as 2023. *Tak Chun*, 96 Cal. App. 5th at 1032–33. In light of this extensive history, it is no surprise that California courts have characterized this policy as "strong, broad, and long-standing." *Kelly*, 72 Cal. App. 4th at 477.

Plaintiffs try to dismiss this policy as obsolete. In their view, the California legislature displaced the policy against gambling-related claims and authorized such claims when it passed the UCL. This argument is only half right. Plaintiffs are correct that the California legislature has the authority to modify common law policies. *Tak Chun*, 96 Cal. App. 5th at 1036. But to exercise that authority, the legislature needed to either expressly repeal the common law policy or provide a clear statement of intent "that necessarily (but implicitly) repeals the common law." *Id.* Silence on the common law policy is insufficient to support repeal. *Id.* at 1037. Yet silence is all the UCL offers. The UCL does not expressly mention gambling at all. *See* Cal. Bus. & Prof. Code § 17200, et seq. Nor is there any clear statement of intent to modify the public policy on gambling-related claims. Plaintiffs suggest that the California legislature intended to protect consumers through the UCL, but that kind of intent is too generic to demonstrate that the legislature "necessarily" meant to abrogate the specific policy against gambling-related claims.

In the alternative, Plaintiffs argue that the policy does not apply because social casinos can be characterized as lotteries under California Penal Code § 319. So, say Plaintiffs, it was not unlawful for them to play social casinos even if it was unlawful for app developers to operate social casinos. Opp'n at 46 (citation omitted). The problem with this argument is that lotteries are still a form of gambling. *W. Telcon, Inc. v. Cal. State Lottery*, 13 Cal. 4th 475, 484 (1996); *see also Kelly*, 72 Cal. App. 4th at 472 (discussing *W. Telcon*). While the exact ways in which

California regulates different types of gambling may differ, the policy against gambling-related claims "applies to all forms of gambling, whether legal or illegal." *See Kelly*, 72 Cal. App. 4th at 490. It is of no consequence whether social casinos are lotteries.

Since gambling is at the heart of Plaintiffs' claims, the Court sees no path for Plaintiffs to plead around this policy. The Court therefore dismisses the California claims with prejudice.

**D. Gambling Loss Recovery Statutes**

Next, the Court addresses Plaintiffs' claims under various states' gambling loss recovery statutes. These laws create specialized causes of action that allow a plaintiff to recover money lost in gambling. Plaintiffs bring claims under such laws in twenty-one different states: Alabama, Arkansas, Connecticut, Georgia, Illinois, Indiana, Kentucky, Minnesota, Mississippi, Missouri, Montana, New Jersey, New Mexico, New York, Ohio, Oregon, South Carolina, Tennessee, Virginia, Washington, and West Virginia.[4] The Arkansas claim is alleged solely against Meta, who does not seek dismissal of that claim. *See* Meta MTD. Similarly, the Montana claim is alleged against solely Google and Meta, and neither seek dismissal of that claim. *See* Google MTD at 23–24; Google Reply at 13–15; Meta MTD. The Court therefore excludes the Arkansas and Montana loss recovery claims from consideration in this Order.

As to the rest of the loss recovery statutes, Defendants seek dismissal at this stage on just two issues: who may be sued and what may be recovered. First, Defendants contend that they do not fall within the categories of parties who may be sued under many of these statutes. Second, Defendants contend that the purchase of virtual chips is not the kind of "loss" recoverable under these statutes. Defendants do not, however, address whether the games offered in social casino apps constitute illegal gambling. Thus, for purposes of this Order, the Court assumes that the games in social casinos are illegal gambling subject to the loss recovery statutes.

[4] Ala. Code § 8-1-150; Ark. Code § 16-118-103; Conn. Gen. Stat. § 52-554; Ga. Code § 13-8-3; 720 Ill. Comp. Stat. 5/28-8; Ind. Code § 34-16-1-2; Ky. Rev. Stat. § 372.020; Minn. Stat. § 541.20; Miss. Code § 87-1-5; Mo. Rev. Stat. § 434.030; Mont. Code § 23-5-131; N.J. Stat. § 2A:40-5; N.M. Stat. § 44-5-1; N.Y. Gen. Oblig. Law § 5-419; Ohio Rev. Code § 3763.02; Or. Rev. Stat. § 30.740; S.C. Code § 32-1-10; Tenn. Code § 29-19-104; Va. Code § 11-15; Wash. Rev. Code § 4.24.070; W. Va. Code § 55-9-2.

**1. Who May Be Sued**

Many of the loss recovery statutes identified above permit plaintiffs to recover their losses from specific types of parties. Most commonly, these statutes limit plaintiffs to recovering their losses from a "winner." Other loss recovery statutes extend their reach further by allowing recovery against both winners and other types of parties. In addressing Defendants' arguments about who may be sued, the Court starts with the statutes limited solely to winners. Only after that does the Court address the statutes that restrict whom a plaintiff may recover from but also allow recoveries from parties other than winners.

**a. Winners**

Connecticut, Georgia, Illinois, Minnesota, Ohio, South Carolina, Virginia, and West Virginia expressly limit claims under their loss recovery statutes to those raised against "winners."[5] Claims under New Mexico law are limited to winners as well, even though the statutory provision authorizing loss recovery claims does not so specify. *See* N.M. Stat. § 44-5-1. That is because a related provision, authorizing suit by the relatives of someone who suffered a gambling loss, restricts relatives to "remed[ies] against the winner." N.M. Stat. § 44-5-3. Reading these two provisions together, the New Mexico Supreme Court held that "[i]t is apparent . . . that the right of action is given against the winner of the bet." *Armstrong v. Aragon*, 79 P. 291, 292 (N.M. 1905).

Although many of these statutes are similarly structured, state courts have put slightly different glosses on each. The Court therefore analyzes their commonalities together before turning to arguments based in state-specific precedents.

**i. Common Interpretation**

As a general matter, one cannot be a winner unless she risks losing money to the plaintiff. The Illinois statute demonstrates why this is so. It allows someone "who by gambling shall lose

[5] Conn. Gen. Stat. § 52-554 ("recover from the winner"); Ga. Code § 13-8-3(b) ("may be recovered from the winner"); 720 Ill. Comp. Stat. 5/28-8(a) ("in a civil action against the winner thereof"); Minn. Stat. § 541.20 ("to the winner"); Ohio Rev. Code § 3763.02 ("from the winner thereof"); S.C. Code § 32-1-10 ("from the respective winner or winners thereof"); Va. Code § 11-15 ("recover from the winner"); W. Va. Code § 55-9-2 ("recover back from the winner").

. . . any sum of money or thing of value . . . [to] recover the money or other thing of value . . . [from] the winner thereof." 720 Ill. Comp. Stat. Ann. 5/28-8(a). "Winner" under this statute, then, refers to someone who won money that another lost "by gambling." In other words, a winner is someone "whom a player has played with and lost to." *Sonnenberg v. Amaya Grp. Holdings (IOM) Ltd.*, 810 F.3d 509, 510 (7th Cir. 2016). This in turn suggests that a winner must have "a direct stake in the outcome of the gambling." *Fahrner v. Tiltware LLC*, No. 13-cv-0227, 2015 WL 1379347, at *7 (S.D. Ill. Mar. 24, 2015), *aff'd sub nom. Sonnenberg*, 810 F.3d 509. A person who does not risk her "earned money . . . on the outcome of a game" cannot be a winner. *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 740 (N.D. Ill. 2016); *see also Reuter v. MasterCard Int'l, Inc.*, 397 Ill. App. 3d 915, 923, 921 (2010) (holding that a defendant whose earnings were "not affected by the outcome of the gambling" was not a winner); *Anderson v. Naperville Rotary Charities Inc.*, No. 1-18-0312, 2019 WL 1368551, at *5 (Ill. App. Ct. Mar. 22, 2019) [6] ("[A] winner must put its own money at risk."); *Langone v. Kaiser*, No. 12-cv-2073, 2013 WL 5567587, at *7 (N.D. Ill. Oct. 9, 2013) ("Since FanDuel does not risk its own money . . . it cannot be a winner or loser under the Loss Recovery Act.").

The loss recovery statutes in Connecticut, Minnesota, Ohio, South Carolina, and Virginia are structured like the Illinois statute—they make clear that a "winner" is one who won a game or bet—so the Illinois construction of "winner" applies equally to those statutes.[7] The same is true of the New Mexico statute since state courts have limited it to actions against "the winner of the bet." *Armstrong*, 79 P. at 292. To win a bet, a person must have participated in the bet and therefore must have risked losing the bet.

---

[6] To the extent Illinois Supreme Court Rule 23(e)(1) prohibits Illinois state courts from citing unpublished, pre-2021 appellate decisions, that rule does not prevent federal courts from considering such decisions for the persuasiveness of their reasoning. *United States v. Hillcrest Resort, Inc.*, No. 15-cv-04194, 2019 WL 6112840, at *2 (C.D. Ill. Nov. 18, 2019) (collecting cases). The Court therefore cites *Anderson* as persuasive authority.

[7] Conn. Gen. Stat. § 52-554 (winner of money lost "by playing at any game, or betting"); Minn. Stat. § 541.20 (winner of money lost "by playing at cards, dice, or other game, or by betting"); Ohio Rev. Code § 3763.02 (winner of money lost "by playing a game, or by a wager"); S.C. Code § 32-1-10 (winner of money lost "by playing at cards, dice table or any other game); Va. Code § 11-15 (winner of money lost "by playing at any game or betting").

The Georgia statute is different in that it ties "winners" to "gambling contracts" and "gambling consideration" rather than a game or a bet. Ga. Code. § 13-8-3. Still, the outcome does not change. Georgia law defines a "gambling contract" as "one in which the parties in effect stipulate that they shall gain or lose upon the happening of an . . . event." *Hardin v. NBC Universal, Inc.*, 283 Ga. 477, 479 (2008) (quoting *Martin v. Citizens' Bank of Marshallville*, 177 Ga. 871, 874 (1933)). And it defines "gambling consideration" as the consideration that "fall[s] to the one or the other upon the determination of the specified event." *Id.* So, by definition, the parties to a gambling contract risk losing gambling consideration. Given that a winner under the Georgia loss recovery statute must have been party to a gambling contract, a winner necessarily faced the risk of loss. Thus, the Illinois construction applies to the Georgia statute as well.

The West Virginia statute presents a trickier interpretive question because it does not tie recoverable money to a specific game or bet, W. Va. Code § 55-9-2, and there are few cases interpreting the statute. Nonetheless, the Court finds that the Illinois construction applies to the West Virginia loss recovery statute. A neighboring provision is expressly tied to games and bets. W. Va. Code § 55-9-1. Meanwhile, the little case law that does exist suggests that winner must have participated in the game or bet. *See Berns v. Shaw*, 64 S.E. 930, 932 (W. Va. 1909) (finding that two different parties were winners because both parties operated the roulette wheel at which the plaintiff lost money).

In short, a person cannot be a winner under any of these states' laws without risking a loss in a game, wager, or bet. Defendants do not meet that definitional requirement. When Defendants receive their commission from purchases of virtual chips, those commissions are not contingent on the outcome of any slot machine spin, game, wager, or other bet. *See Reuter*, 397 Ill. App. 3d at 923 (2010) (reaching the same conclusion for credit card companies that collect a percentage transaction fee). There is no risk that Defendants will lose those commissions, so they are not winners.

Naturally, Plaintiffs disagree. According to them, each Defendant does have a stake in the outcome of virtual slot spins, likening Defendants to "the house" in a physical casino. Slot machines put the house's money at risk because the house must pay out to any player who wins a

slot machine spin. That is true as far as it goes, but it does not salvage Plaintiffs' claims. If a social casino user wins a slot spin, they receive a payout in the form of more virtual chips. Apple Compl. ¶ 60. It is the social casino app itself, not Defendants, that provides the additional chips. The newly awarded chips do not come out of Defendants' pockets.

But, counter Plaintiffs, that is not the end of the story. Even if Defendants do not lose money at the exact moment a social casino player wins a spin, Defendants will still lose future profits. The winning player, armed with a large stack of newly awarded chips, will not buy as many virtual chips later. That cuts into the social casino app's future chip sales and, by extension, Defendants' cut of those in-app sales. In essence, Plaintiffs argue that Defendants' future profits are at risk. Courts have rejected that logic, and for good reason. *See Phillips*, 173 F. Supp. 3d at 740; *Ristic v. Mach. Zone, Inc.*, No. 15-cv-8996, 2016 WL 4987943, at *3 (N.D. Ill. Sept. 19, 2016). The future revenues that Plaintiffs identify are too attenuated from the game at issue, and they are too speculative as well. Those revenues depend on a player continuing to play social casino apps, losing slot spins, and then deciding to purchase more chips. None of those steps are guaranteed to occur.

It is also most natural to speak of "winning" a particular "prize or a reward." *See United States v. 103 Elec. Gambling Devices*, 223 F.3d 1091, 1098 (9th Cir. 2000) (interpreting the term "won" in the Indian Gaming Regulatory Act). The possibility that Defendants might gain some future benefit due to a chain of contingent events—namely, that Defendants might be able to collect greater commissions from in-app sales of virtual chips—can hardly be said to be the prize or reward of a game. Only the immediate object of a game can be won. Defendants no more "win" future commissions from a player's losing slot spin than a casino "wins" the future profits it might realize by investing the money it receives from losing players.

Plaintiffs press one last point. They assert that Defendants are winners because by the time Defendants process a payment for virtual chips, the gambling has already begun. From Plaintiffs' perspective, this means that Defendants are gambling participants in addition to the social casinos themselves and the individuals playing social casino games. This argument does not move the needle because the aspect of "winner" that Plaintiffs have failed to plead is risk of loss.

Defendants' participation or non-participation in the gambling at issue is irrelevant to the Court's conclusion that Defendants are not winners.

**ii. State-Specific Precedents**

Plaintiffs' state-specific arguments are not availing either.

***Connecticut and West Virginia.*** Plaintiffs' arguments on Connecticut and West Virginia law can be quickly disposed of. With respect to Connecticut, Plaintiffs cite *Mendelsohn v. BidCactus, LLC*, No. 3:11-cv-1500, 2012 WL 1059702 (D. Conn. Mar. 28, 2012), for the proposition that they can recover from Defendants even if Defendants were not winners. *BidCactus* does not say that. In fact, it says nothing at all about what it means to be a winner under the Connecticut loss recovery statute. *BidCactus* focused on questions about the definition of illegal gambling and the existence, or not, of a statute of limitations. *Id.* at *3–5. As for West Virginia, Plaintiffs claim that *Berns v. Shaw*, 64 S.E. at 932, permits them to collect from both winners and those acting in concert with winners. That argument also fails. While *Berns* did involve partners in a roulette operation, the West Virginia Supreme Court of Appeals did not hold that both could be liable simply because they were working together. Instead, the key was that both had operated the roulette table and thus both were independently winners. *Id.*

***Georgia and Ohio.*** For Georgia and Ohio, Plaintiffs assert that case law expands the reach of the states' loss recovery statutes to "stakeholders" and "bookmakers" in addition to winners. Plaintiffs are correct on that front. The issue for Plaintiffs is that Defendants are neither "stakeholders" nor "bookmakers" as Georgia and Ohio courts use those terms.

The Georgia Supreme Court has expressly held that plaintiffs can recover losses "from the stakeholder" in addition to the winner. *Quillian v. Johnson*, 49 S.E. 801, 805 (Ga. 1905); *see also Alford v. Burke*, 21 Ga. 46, 50 (1857) (affirming a plaintiff's right to "recover the money deposited by him with a stakeholder"). In doing so, the Georgia Supreme Court treated "stakeholder" like a term of art in the gambling context, not as a general reference to anyone with an interest. Quite literally, a stakeholder in the gambling context is one who holds the stakes of a wager and then passes those stakes to the ultimate winner—an escrow agent of sorts. That was precisely the situation in *Alford*, where the stakes were "five hundred dollars, paid into the hands of the

defendant, as stakeholder, upon a bet." 21 Ga. at 47. And it was also the case in *Quillian*, where the stakes were a life insurance policy, and the stakeholder was the insurance company responsible for paying out that policy. 49 S.E. at 801, 804. Defendants' roles here are nothing like the stakeholders' roles in *Quillian* and *Alford* since Defendants had no obligation to make any payments to the social casinos or their players based on the result of a virtual slot spin.

Ohio case law is similar. In *Yantis v. Murnan*, 20 Ohio Law Abs. 356, 359 (Ohio Ct. App. 1935), the Ohio Court of Appeal found that liability could extend to a "bookmaker, that is, a person who takes bets and wagers on horse races." The way that *Yantis* defines "bookmaker" is nearly identical to how Georgia law defines "stakeholder." The reason Defendants are not bookmakers under Ohio law is likewise nearly identical to the reasons they are not stakeholders under Georgia law. Separately, Plaintiffs cite to *Lester v. Buel*, 49 Ohio St. 240, 253–54 (1892), as a case that expands the definition of a "winner" under Ohio law. However, *Lester* does the opposite by restricting the definition to exclude agents of the losing party. *Id.*

***Illinois.*** Plaintiffs invest most of their time in addressing Illinois law, because the Illinois loss recovery statute is the most developed out of all of them. They refer to a bevy of cases in their opposition in an effort to support their position. Opp'n at 31. The Illinois Appellate Court (the intermediate Illinois appeals court) already considered many of those cases in *Reuter*, and it explained why those cases do not change the result. *Reuter*, 397 Ill. App. 3d at 925–27. The Court agrees and adopts *Reuter*'s reasoning on those cases. In any event, Plaintiffs ultimately concede that "the common thread in the Illinois cases . . . is the rule that to be a winner, a person must have a direct stake in the outcome of the gambling." Opp'n at 31 (citation modified). Given that admission, the Court's analysis of Plaintiffs' universal counterarguments fully resolves Plaintiffs' Illinois-specific counterarguments in favor of dismissal.

***Minnesota, South Carolina, and Virginia.*** Plaintiffs' remaining state-specific arguments can be taken together. Plaintiffs believe that the view of "winner" adopted by the Court is too narrow as to Minnesota, South Carolina, and Virginia because each of those states instructs courts to liberally construe their loss recovery statutes. Opp'n at 30 (citing *Foley v. Whelan*, 219 Minn. 209, 213 (1945); *Berkebile v. Outen*, 311 S.C. 50, 55 (1993); *McIntyre v. Smyth*, 108 Va. 736, 745

(1908)). To be sure, the principle of liberal construction is a helpful tool when it comes to statutory interpretation. But its role is minimal when the statutory language is clear; in those instances, the Court must apply the plain meaning of the text. *Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn. 2010); *Brown v. S.C. Dep't of Health & Env't Control*, 348 S.C. 507, 515 (2002); *Parker v. Warren*, 273 Va. 20, 23 (2007). And the plain text of these three states' statutes unambiguously links winning to specific games or wagers. *See supra* note 7. To win a game, one must participate and risk losing.

Lastly, Plaintiffs argue that Minnesota and South Carolina extend liability to the "keepers" of a slot machine. Opp'n at 27–28 (citing *Foley*, 219 Minn. at 214–15; *McCurry v. Keith*, 312 S.C. 254, 255 (Ct. App. 1994)). That argument is a variation on Plaintiffs' "house" argument since the keeper of a slot machine is the one responsible for making payments to winning players, just like the house. The Court rejects this argument just as it rejected the house argument.

* * *

The Court grants the motions to dismiss Plaintiffs' loss recovery claims under Connecticut, Georgia, Illinois, Minnesota, New Mexico, Ohio, South Carolina, Virginia, and West Virginia law for failure to plead that Defendants are "winners."

**b. Other Types of Parties**

***Stakeholders and Depositaries.*** The New York and New Jersey loss recovery statutes authorize recovery from "stakeholders" and "depositaries." N.Y. Gen. Oblig. Law § 5-419 (stakeholder); N.J. Stat. § 2A:40-5 (stakeholder or depositary). Fortunately, and unlike most of these loss recovery statutes, the New York statute offers a ready definition of stakeholder: someone "in whose hands shall be deposited any such wager, bet or stake." N.Y. Gen. Oblig. Law § 5-419. This is consistent with legal dictionaries. *Stakeholder*, Black's Law Dictionary (12th ed. 2024) ("Someone who holds the money or valuables bet by others in a wager."); *Stakeholder*, Ballentine's Law Dictionary (3d ed. 1969) ("One with whom money or property is deposited to abide the result of a gambling contract or transaction."). It is also the same definition that Georgia and Ohio precedents have adopted. As such, Defendants are not stakeholders under New York law just as they are not under Georgia and Ohio law. *See supra* Section III.D.1.a.ii.

The New Jersey statute does not offer any explicit definitions. But the definitions from the legal dictionaries cited above are informative, and case law shows that the meanings of "stakeholder" and "depositary" accord with those dictionary definitions. *See Hartford Accident & Indem. Co. v. Benevento*, 133 N.J.L. 315, 317 (1945) (finding a "bookmaker" who "took bets" to be a depositary); *Hensler v. Jennings*, 62 N.J.L. 209, 210 (1898) (indicating that a stakeholder holds the wagers made when others enter a bet). The Court therefore concludes that "stakeholder" and "depositary" in the New Jersey statute have the same meaning as "stakeholder" in the New York statute. Defendants are not stakeholders or depositaries under New Jersey law, either.

***Proprietors.*** The Oregon and Washington loss recovery statutes allow plaintiffs to recover from the "proprietor for whose benefit such game was played or dealt." Or. Rev. Stat. § 30.740; Wash. Rev. Code § 4.24.070 (same). Defendants, though, are not proprietors.

Generally speaking, a proprietor is "[a]n owner, esp[ecially] one who runs a business." *Proprietor*, Black's Law Dictionary (12th ed. 2024). That definition is consistent with how courts have interpreted the Oregon and Washington statutes. For instance, the Oregon Supreme Court has held that the owner of a café where poker games were being held, and who also operated the poker tables at the café, were proprietors under Oregon law. *Lairmore v. Drake*, 185 Or. 239, 241–42 (1949). Interpreting Washington law, the Ninth Circuit reached a similar conclusion, finding that a social casino's "owner and operator" was the proprietor of that social casino. *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 785, 789 (9th Cir. 2018). Based on these decisions, and in the context of loss recovery statutes, the Court interprets "proprietor" to mean "one who owns or operates a gambling venture." Defendants do neither own nor operate any social casinos, so they are not proprietors.

The Court grants the motions to dismiss Plaintiffs' loss recovery claims under New York, New Jersey, Oregon, and Washington law for failure to plead that Defendants are the type of party from whom recovery can be sought.

### 2. What May Be Recovered

Defendants' second argument applies to all the loss recovery claims in these matters (except the claims under Arkansas and Montana law, which no Defendant has sought dismissal

of). Defendants note that, by nature of being *loss* recovery statutes, these statutes authorize recoveries only of gambling *losses*. From their vantage point, any gambling happens when Plaintiffs use their virtual chips to spin a slot machine, not when Plaintiffs purchased the virtual chips. Since Defendants were involved in the first transaction (purchasing of chips) but not the second (spinning of slots), Defendants submit that the commission that they collect in the first transaction is not a gambling loss.

To the extent that Defendants believe the purchase of virtual chips is not a gambling transaction at all, the Court disagrees. Purchasing virtual chips serves a single purpose—to gamble. A transaction made for the sole purpose of gambling cannot be anything other than a gambling transaction. Defendants protest that virtual chips can serve other purposes as well, but on a motion to dismiss, the Court must take Plaintiffs' factual allegations as true. Plaintiffs have pled that virtual chips cannot be used outside of social casino apps. Apple Compl. ¶ 65. And within those apps, chips can be used only to spin slot machines, play some card or bingo games, or be gifted to others using the app. *Id.* Recall that Defendants make no argument about what games are or are not illegal gambling, so the Court is assuming that all the games in social casino apps constitute illegal gambling. In view of that assumption, virtual chips can only be used for illegal gambling, and that must be their purpose. As a consequence, the purchase of those chips is a gambling transaction.

In resisting this conclusion, Defendants observe that virtual chips can be gifted, and gifting is not gambling. That observation does not change the Court's conclusion, though. After all, nearly any item can be gifted, but gifting does not change an item's underlying nature. Consider the purchase of a lottery ticket. It is easy to conclude that the purchase is a lottery transaction. That is true even though the person purchasing the ticket can gift it to someone else. And it remains true even if that person does eventually gift the lottery ticket. The purpose of a lottery ticket is to play the lottery regardless of the ticketholder's ability to gift the ticket.

That said, characterizing the purchase of virtual chips as a gambling transaction is just half the equation. Most of the loss recovery statutes—those from Alabama, Connecticut, Georgia, Indiana, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, New York, Ohio, Oregon,

South Carolina, Tennessee, Virginia, and Washington—restrict recovery to losses specifically tied to a game or wager.[8] The purchase of virtual chips, while a gambling transaction, is not a game or a wager. That comes afterwards, when Plaintiffs actually spin a slot machine or play another game within the social casinos. Accordingly, Plaintiffs have failed to plead recoverable losses under these states' loss recovery statutes.

That leaves the Illinois and West Virginia loss recovery statutes. The Illinois statute limits recoverable losses to those incurred "by gambling." 720 Ill. Comp. Stat. Ann. 5/28-8(a). That language plausibly extends the reach of Illinois's law to gambling transactions writ large in addition to games and wagers. As for West Virginia law, the loss recovery statute itself does not identify the types of losses recoverable. W. Va. Code § 55-9-2. For a second time, though, a neighboring provision offers some help. That provision suggests that losses can include "money lent or advanced . . . to be used in being bet." W. Va. Code § 55-9-1. So far as this second provision informs interpretation of the first, a purchase of virtual chips might fall within "money lent or advanced." However, the Court need not and does not decide these interpretive questions with regard to Illinois and West Virginia law because the Court has already held above that claims under those states' laws must be dismissed for failure to plead that Defendants are winners.

[8] Ala. Code § 8-1-150(a) ("lost upon any game or wager"); Conn. Gen. Stat. § 52-554 ("by playing at any game"); Ind. Code § 34-16-1-2 ("by betting on a game"); Minn. Stat. § 541.20 ("by playing at cards, dice, or other game"); Miss. Code § 87-1-5 ("by playing at any game whatever"); Mo. Rev. Stat. § 434.030 ("at any game, gambling device or by any bet or wager whatever"); N.M. Stat. § 44-5-1 (at any game at cards, or at any gambling device"); N.Y. Gen. Oblig. Law § 5-419 ("upon the event of any wager or bet"); Ohio Rev. Code § 3763.02 ("by playing a game"); Or. Rev. Stat. § 30.740 ("at or on any unlawful game"); S.C. Code § 32-1-10 ("by playing at cards, dice table or any other game whatsoever"); Tenn. Code § 29-19-104 ("lost upon any game or wager"); Va. Code § 11-15 ("by playing at any game"); Wash. Rev. Code § 4.24.070 ("at or on any illegal gambling games")

The Georgia statute is limited to losses "upon a gambling consideration." Ga. Code § 13-8-3(b). "Gambling consideration" is defined as the consideration that "fall[s] to the one or the other upon the determination of the specified event," meaning the stakes of a bet or wager. *Hardin*, 283 Ga. at 479. Thus, the losses referred to by the Georgia statute must be money that was lost at a bet or wager.

The New Jersey statute is limited to losses incurred "in violation of section 2A:40-1." N.J. Stat. § 2A:40-5. In turn, § 2A:40-5 refers specifically to "wagers, bets or stakes . . . or upon any gaming." N.J. Stat. § 2A:40-5. So, losses under New Jersey law must be those incurred in wagers, bets, or games.



United States District Court
Northern District of California

In conclusion, the Court grants the motions to dismiss Plaintiffs' loss recovery claims under Alabama, Connecticut, Georgia, Indiana, Minnesota, Mississippi, Missouri, New Jersey, New Mexico, New York, Ohio, Oregon, South Carolina, Tennessee, Virginia, and Washington law for failure to plead recoverable losses.

**3. Kentucky Law**

Up to this point, the Court has carefully avoided discussing Kentucky's loss recovery statute. That is because it is somewhat idiosyncratic. For one, Kentucky's statute applies to both "winners" and "transferees of the winner." Ky. Rev. Stat. § 372.020. More importantly, the Kentucky Supreme Court has construed "winner" in an exceptionally broad manner when compared to "winner" in other states' statutes. Under Kentucky law, "winners [] include individuals who take any portion of the amount lost." *Commonwealth ex rel. Brown v. Stars Interactive Holdings (IOM) Ltd.*, 617 S.W.3d 792, 807 (Ky. 2020). There is no requirement that a winner put anything at risk. Indeed, there was no risk to the winner in *Stars Interactive*, who "took a percentage from the wagers" made in virtual poker games played on the winner's website. *Id.* at 806. Defendants, who take a thirty percent cut of the proceeds from every in-app sale of virtual chips, plausibly satisfy that definition of winner.

The issue remains as to whether that thirty percent commission is a recoverable loss. Defendants say no, pointing to language from *Stars Interactive* that they say limits losses to money from "the wagers in each of the poker games" or a "rake or percentage of the pot." *Id.* at 806–07. According to Defendants, the references to wagers and pots limit losses to those sustained while playing a game. The references in *Stars Interactive* are best understood as simply describing the facts in front of the Kentucky Supreme Court in that particular case. The Kentucky statute itself allows recovery of any money that a "person loses to another at one (1) time, or withing twenty-four (24) hours." Ky. Rev. Stat. § 372.020. The statute does not require the money to be lost at a game or wager. Plaintiffs alleged they lost their money to Defendants in a gambling transaction (the purchase of virtual chips), and that is sufficient to survive the pleading stage. The Court denies Defendants' motions as to claims raised under the Kentucky loss recovery statute.

United States District Court
Northern District of California

United States District Court
Northern District of California

### E. Consumer Protection Laws

Compared to the loss recovery statutes, the parties devote scant attention to the consumer protection claims—understandably so, given the volume of claims in these matters. With a limited number of pages to work with, the parties needed to prioritize. Nonetheless, the fact of the matter is that many important issues are underdeveloped.

Here is how the briefs are set up: In their opening argument, Defendants insist that the consumer protection claims must be dismissed for failure to plead statutory standing. Plaintiffs sought to purchase virtual chips and got those chips, so Plaintiffs received the benefit of the bargain. For their part, Plaintiffs do not dispute that they received the benefit of the bargain. Instead, they argue that it does not matter. Since their consumer protection claims are based on a purportedly illegal transaction—gambling—Plaintiffs say that the benefit of the bargain defense does not apply. In reply, Defendants try to sidestep around Plaintiffs' argument. Defendants do not contest that the benefit of the bargain defense is inapplicable when it comes to allegedly illegal conduct. Rather, they argue that there was no illegal conduct at all because the purchase of virtual chips is not a gambling transaction. They also suggest that consumer protection law only protects against deceptive or fraudulent conduct, not illegal conduct writ large.

All this leaves significant issues on which the parties have not truly engaged with each other. For example, when is the benefit of the bargain defense available? Can alleged illegality even form the basis of a consumer protection claim, or are such claims limited to deceptive or fraudulent conduct? The parties do not say, and without the aid of robust party presentation, it is prudent for the Court to avoid answering these far-reaching questions for now. Just two issues are developed enough for decision, and neither supports dismissal.

***First***, have Plaintiffs alleged that the purchase of virtual chips is an illegal transaction? Yes, they have. When analyzing Plaintiffs' loss recovery claims, the Court concluded that the purchase of virtual chips is a gambling transaction. *Supra* Section III.D.2. As the Court is also assuming that the underlying gambling in social casino apps is illegal, that purchase is also an illegal transaction. Because Defendants do not dispute that the benefit of the bargain defense is unavailable when it comes to illegal transactions, that defense is not grounds for dismissal.

Defendants' citations to other cases involving virtual currency are unpersuasive. The virtual currencies at issue in these other cited cases were legal, unlike the virtual chips here, because those other virtual currencies could be used to make legal in-game purchases. *See Taylor v. Apple, Inc.*, No. 20-cv-03906, 2022 WL 35601, at *3 (N.D. Cal. Jan. 4, 2022) (finding that the in-game items being purchased with virtual currency were not "plainly prohibit[ed]"); *Coffee v. Google, LLC*, No. 20-cv-03901, 2021 WL 493387, at *10 (N.D. Cal. Feb. 10, 2021) (virtual currency could be used to directly purchase in-game items that were undoubtedly legal, such as weapons or characters); *Mai v. Supercell Oy*, 648 F. Supp. 3d 1130, 1135 (N.D. Cal. 2023) ("Plaintiffs have not plausibly alleged that . . . loot boxes constitute[] illegal gambling."), *vacated on other grounds*, 2024 WL 2077500 (9th Cir. May 9, 2024).

***Second***, do Plaintiffs state a claim under the Kentucky Consumer Protection Act (KCPA)? Although the parties' primary dispute is over the benefit of the bargain defense, they provide some specific arguments about the KCPA. To plead a KCPA claim, a plaintiff must allege that she purchased or leased "goods or services." Ky. Rev. Stat. § 367.220(1). Defendants cite case law holding that the purchase of virtual chips is not a service because there is no "ongoing contractual relationship" between Defendants and Plaintiffs. *Collins v. Ky. Lottery Corp.*, 399 S.W.3d 449, 453 (Ky. Ct. App. 2012); *see also Jacobs v. KRM Wagering, LLC*, No. 2022-CA-0543, 2023 WL 3397511, at *5 (Ky. Ct. App. May 12, 2023) (similar). The ongoing relationship requirement, however, is the test for services, not for goods. *Collins*, 399 S.W.3d at 453; *Jacobs*, 2023 WL 3397511, at *5. And while *Collins* held that lottery tickets were not goods because they were "intangible" "chance[s] to win money," Defendants never argue that virtual chips are intangible and therefore fall outside the KCPA's scope. *Collins*, 399 S.W.3d at 452–53. Absent further development on the issue of what it means to be a tangible good, the Court sees no ground for dismissal.

The Court denies Defendants' motions to dismiss as to all claims brought under consumer protection laws (except for the California claims, which were dismissed above for an independent reason).

United States District Court
Northern District of California

**F. Unjust Enrichment**

The parties' unjust enrichment arguments are much like those made regarding the consumer protection statutes. The parties dispute whether the purchase of virtual chips is illegal, this time in the context of whether it is an injustice for Defendants to retain their commissions on those purchases. For the third time, the Court finds that Plaintiffs have pled that such purchases are illegal. However, Defendants have also argued that the unjust enrichment claims must be dismissed as duplicative of Plaintiffs' other claims. Apple MTD at 33–34. It is not clear to the Court that this is universally true under the law of every state at issue. But Plaintiffs do not really contest this point. Opp'n at 40 n.8. Plaintiffs contend only that the unjust enrichment claims should survive because Plaintiffs' other claims survive. That argument misses the thrust of Defendants' position—that duplicative unjust enrichment claims must be dismissed whether or not Plaintiffs have successfully stated their other claims. As such, Plaintiffs concede the issue, and the Court grants the motions to dismiss as to all unjust enrichment claims. *See Whooley v. Tamalpais Union High Sch. Dist.*, 399 F. Supp. 3d 986, 993 (N.D. Cal. 2019).

**G. RICO**

Finally, the Court reaches Plaintiffs' RICO claims, which include claims for both substantive RICO violations and RICO conspiracy. The Court takes them in turn.

**1. Substantive RICO Violations**

A RICO claim has five elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' 'business or property.'" *Ove v. Gwinn*, 264 F.3d 817, 825 (9th Cir. 2001). The fifth element is sometimes referred to as "RICO standing." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1248 (9th Cir. 2019). Defendants attack the sufficiency of Plaintiffs as to the first, second, and fifth elements. In these circumstances, where the first and fifth elements clearly warrant dismissal, the Court declines to address the second element.

**a. Conduct**

The "conduct" element requires a showing that Defendants "participated" in the relevant RICO enterprise. *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 194 (9th Cir. 1987). Here,

that enterprise is a supposed venture between Defendants and social casino app developers to operate "illegal slot machines." Apple Compl. ¶ 547.

Participation does not require Defendants to take a leadership role in the enterprise, nor even to hold a formal position within the enterprise. *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). What it does require is that Defendants have "some part in directing [the enterprise's] affairs." *Id.* Plaintiffs have not alleged that Defendants play that part in the alleged enterprise. All that Defendants are responsible for is processing payments. As alleged, Defendants take no initiative in developing the social casinos themselves or in steering the business of social casinos. At best, Defendants are passive contributors.

Plaintiffs maintain that this undersells Defendants' role, accusing them of being responsible for "an enormous swath of the financial portion of [the enterprise], including booking the bets, doling out the chips to players, tallying up the proceeds, and dividing up the spoils among the enterprise participants." Opp'n at 58. Yet the complaints do not allege any of this. Processing a payment is not taking a bet or passing out chips; the social casinos themselves are the ones giving out chips and tracking how those chips are used. Nor do the complaints come anywhere close to alleging that Defendants serve as some sort of account divvying up earnings. Plaintiffs allege merely that Defendants have the authority to withhold certain payments that have been processed. Apple Compl. ¶ 100. Plaintiffs never state that Defendants have leverage that authority into control or influence over the enterprise.

For this reason, the Court finds that Plaintiffs have failed to plead conduct.

**b. RICO Standing**

RICO standing itself has two sub-elements. To demonstrate standing, Plaintiffs must show that their alleged injuries were (1) those to their "business or property" and (2) proximately caused by Defendants' alleged violations. *Takeda Pharms.*, 943 F.3d at 1248. The main point of contention is whether gambling losses are injuries to business or property. In *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083 (9th Cir. 2002), the Ninth Circuit definitively answered this question in Defendants' favor.

*Chaset* involved the sale of trading card packs, which included a random mix of standard cards and rarer, more valuable "chase" or "insert" cards. *Id.* at 1086. The *Chaset* plaintiffs sued the makers of those cards, alleging that the sale of trading card packs constituted gambling. *Id.* The Ninth Circuit affirmed dismissal, explaining that persons are not injured in their business or property when purchasing a card pack because they "receive[] value—eight or ten cards, one of which might be an insert card—for what they paid as a purchase price." *Id.* at 1087. Or phrased more generally, they received the benefit of the bargain.[9] To the extent that the *Chaset* plaintiffs argued that they were injured not at the moment of purchase, but when they opened a pack and found that it did not include a chase card, the Ninth Circuit rejected that injury as well. The injury in that situation is disappointment, which is not an injury to property. *Id.*; *see also Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998) ("Injury to mere expectancy interests . . . is not sufficient to confer RICO standing.").

Courts interpreting *Chaset*, from both this circuit and others, have uniformly concluded that "a disappointing gambling loss after receiving what was paid for is not injury to property sufficient for RICO standing." *McLeod v. Valve Corp.*, No. 16-cv-1227, 2016 WL 5792695, at *4 (W.D. Wash. Oct. 4, 2016); *see also Romano v. Torch Elecs., LLC*, No. 2:23-cv-04043, 2023 WL 9064602, at *3 (W.D. Mo. Aug. 21, 2023); *Adell v. Macon Cnty. Greyhound Park, Inc.*, 785 F. Supp. 2d 1226, 1238 (M.D. Ala. 2011); *Green v. Aztar Corp.*, No. 02-cv-3514, 2003 WL 22012205, at *2 (N.D. Ill. Aug. 22, 2003).

The Court thus concludes that Plaintiffs have failed to allege injury to business or property. Plaintiffs did not suffer such an injury when purchasing virtual chips because they received what

[9] Defendants also raised a benefit of the bargain defense in seeking to dismiss the consumer protection claims. The Court rejected that defense because Defendants failed to dispute that such a defense is not applicable when an illegal transaction is involved. By contrast, when it comes to benefit of the bargain principles in the RICO context, binding precedent makes clear that those principles do apply even if the underlying transaction is illegal gambling. *Chaset*, 300 F.3d at 1087. This is because RICO standing depends on whether an injury is to business or property, and the fact that certain actions are unlawful does not mean that they must harm business or property as opposed to harming some other interest. *See Rodriguez v. Topps Co.*, 104 F. Supp. 2d 1224, 1227 (S.D. Cal. 2000) ("State law may proscribe gambling irrespective of whether or not it causes injury to business or property . . . ."), *aff'd sub nom. Chaset*, 300 F.3d 1083.

United States District Court
Northern District of California

they paid for—chips that could be exchanged for a chance to win a virtual slot spin. And they did not suffer such an injury when they lost on a slot machine, because losing is injury to intangible expectations.

Plaintiffs attempt to evade this conclusion by arguing that social casinos are manipulated or rigged. Apple Compl. ¶ 531. That way, Plaintiffs would not have received the benefit of their bargain. While they paid money expecting to receive a fair chance to win at virtual slots, they did not actually receive a fair chance. That might well be a winning argument had Plaintiffs alleged *how* social casino apps are rigged. But they did not, making only the conclusory allegation that social casino apps *are* rigged. *Id.*

Plaintiffs have failed to plead RICO standing.[10]

* * *

The Court dismisses Plaintiffs' substantive RICO claims.

**2. RICO Conspiracy**

In order to successfully plead a RICO conspiracy, Plaintiffs must first plead a substantive violation of RICO. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010). Since Plaintiffs have failed to plead a substantive violation, the Court dismisses the conspiracy claim as well.

## IV. INTERLOCUTORY APPEAL

The Court sua sponte certifies this Order, and its prior order on Section 230, for immediate appeal under 28 U.S.C. § 1292(b). When the Court certified its prior order based on the importance of the Section 230 issues raised, a motions panel of the Ninth Circuit initially granted permission to appeal, indicating that the issues involved were significant enough to warrant the Circuit's immediate consideration. Although the merits panel eventually dismissed the appeal, it

[10] Defendants suggest that the Court could not consider any allegations of manipulation even if Plaintiffs had pled them because the Court's Section 230 holding limits Plaintiffs to their payment processing theory. The Court is doubtful that Section 230 restricts the universe of allegations or evidence that may be considered. Section 230 immunity depends on the duty being imposed. *Barnes*, 570 F.3d at 1102. As long as that duty remains the same, the Court sees no reason why it cannot consider facts that are unrelated to payment processing.

United States District Court
Northern District of California

did so not because the issues were unimportant, but because the Court had not yet dismissed (or declined to dismiss) any specific claims. *See* USCA Mem. The Court has now addressed specific claims, and the importance of the Section 230 issues has not changed.

Moreover, new issues have arisen since then. For example, part of the Court's Section 230 analysis required it determine if monitoring of third-party content was necessary to comply with the duties implicated by Plaintiffs' claims, or if monitoring was just one option. *See HomeAway*, 918 F.3d at 682. The Court found that it was not necessary, but there is no precedent explaining how to determine necessity. Another court may well have come out differently.

*Calise*, which had not yet been decided when the Court first certified interlocutory appeal, also presents serious theoretical concerns. *Calise* seems to suggest that Section 230 applies when a duty requires monitoring even if that duty does not spring from a defendant's status or conduct as publisher. *Calise*, 103 F.4th at 742; *see also id.* at 746 (R. Nelson, J., concurring); *Twitter*, 148 F.4th at 640, 642. Yet, that appears to conflict with *Barnes*. In *Barnes*, the defendant "promised to take down third-party content from its website." 570 F.3d at 1107. The Circuit held that Section 230 immunity did not attach to claims enforcing that promise because the duty triggered is not one that stems from the defendant's status as publisher. *Id.* at 1107–09. However, for the defendant to take down third-party content, it would seem that the defendant must monitor the third-party content on its website. And if that were so, then Section 230 immunity should apply under *Calise*, creating a seeming contradiction.

In fact, *Calise* itself illustrates this apparent contradiction. There, the Ninth Circuit held that Section 230 does not immunize Meta from contract claims based on its "promise to moderate third-party advertisements." *Calise*, 103 F.4th at 743. Moderating advertisements, of course, requires Meta to monitor those advertisements. And that would seem to mean that immunity should apply.

In certifying these orders for interlocutory appeal, the Court declines to issue a stay of these matters. Given the age of these cases and the relatively little activity that has occurred since their filing, it is best to continue pushing these cases forward even as an appeal may be pending.

## V. CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss.[11] Except as dismissed below, Plaintiffs' claims may proceed:

- Apple (Case No. 5:21-md-2985)
  - Counts I and II (the California claims) are **DISMISSED WITH PREJUDICE**.
  - Counts III, VI, IX, XII, XV, XVII, XIX, XXI, XXIV, XXVII, XXIX, XXXI, XXXIII, XXXV, and XXXVII (all loss recovery claims against Apple) are **DISMISSED**.
  - Counts V, VIII, XI, XIV, XVI, XVIII, XX, XXIII, XXVI, XXVIII, XXX, XXXII, XXXIV, XXXVI, and XXXIX (all unjust enrichment claims against Apple) are **DISMISSED**.
  - Counts XL and XLI (the RICO claims) are **DISMISSED**.
- Google (Case No. 5:21-md-3001)
  - Counts I and II (the California claims) are **DISMISSED WITH PREJUDICE**.
  - Counts III, VI, IX, XV, XVII, XIX, XXIV. XXVII, XXIX, XXXI, XXXIII, XXXV, XXXVII, and XL (all loss recovery claims against Google, except for those brought under Kentucky and Montana law) are **DISMISSED**.
  - Counts V, VIII, XI, XIV, XVI, XVIII, XXI, XXIII, XXVI, XXVIII, XXX, XXXII, XXXIV, XXXVI, XXXIX, and XLII (all unjust enrichment claims against Google) are **DISMISSED**.
  - Counts XLIII and XLIV (the RICO claims) are **DISMISSED**.
- Meta (Case No. 5:21-cv-2777)
  - Counts I and II (the California claims) are **DISMISSED WITH PREJUDICE**.
  - Counts III, IX, XII, XVIII, XX, XXV, XXVIII, XXX, XXXII, XXXIV, and

[11] The Court does not address Defendants' argument that *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) requires dismissal of equitable claims because only loss recovery and consumer protection claims remain, but Defendants do not try to identify which of those claims are equitable and which of those claims are legal.

XXXVI (all loss recovery claims against Meta, except for those brought under Arkansas, Kentucky, and Montana law) are **DISMISSED**.

- Counts V, VIII, XI, XIV, XVII, XIX, XXII, XXIV, XXVII, XXIX, XXXI, XXXIII, XXXV, and XXXVIII (all unjust enrichment claims against Meta) are **DISMISSED**.
- Counts XXXIX and XL (the RICO claims) are **DISMISSED**.

The Court **CERTIFIES** this Order and its prior order (ECF No. 106 (Apple), ECF No. 80 (Google), ECF No. 119 (Meta)) for immediate appeal.

Within **twenty-one (21) days**, Plaintiffs shall file a notice indicating whether they intend to proceed on the claims surviving after this Order or whether they intend to file an amended complaint. The parties shall then meet and confer and, within **fourteen (14) days** after the filing of the required notice, submit either a stipulated schedule or a status report with competing scheduling proposals. In conferring on a schedule, the parties should not expect that the Court will further stay discovery regardless of whether Plaintiffs intend to amend.

**IT IS SO ORDERED.**

Dated: September 30, 2025

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

**NOT FOR PUBLICATION**

FILED

MAY 21 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

In re: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION,

______________________________

KATHLEEN WILKINSON, individually and on behalf of all others similarly situated; et al.,

Plaintiffs-Appellees,

v.

FACEBOOK, INC., a Delaware corporation,

Defendant-Appellant.

No. 22-16888

D.C. No. 5:21-cv-02777-EJD

MEMORANDUM*

In re: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION,

______________________________

KATHLEEN WILKINSON, individually and on behalf of all others similarly situated; et al.,

Plaintiffs-Appellants,

v.

FACEBOOK, INC., a Delaware corporation,

No. 22-16889

D.C. No. 5:21-cv-02777-EJD

* This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

Defendant-Appellee.

In re: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

------------------------------

FRANK CUSTODERO; et al.,

Plaintiffs-Appellees,

v.

APPLE INC.,

Defendant-Appellant.

No. 22-16914

D.C. No. 5:21-md-02985-EJD

In re: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

______________________________

FRANK CUSTODERO; et al.,

Plaintiffs-Appellants,

v.

APPLE INC.,

Defendant-Appellee.

No. 22-16916

D.C. No. 5:21-md-02985-EJD

In re: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

No. 22-16921

D.C. No. 5:21-md-03001-EJD

JENNIFER ANDREWS; et al.,

Plaintiffs-Appellees,

v.

GOOGLE, LLC; GOOGLE PAYMENT CORP.,

Defendants-Appellants.

In re: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION,

No. 22-16923

D.C. No. 5:21-md-03001-EJD

JENNIFER ANDREWS; et al.,

Plaintiffs-Appellants,

v.

GOOGLE, LLC; GOOGLE PAYMENT CORP.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of California
Edward J. Davila, District Judge, Presiding

Argued and Submitted April 8, 2024
San Francisco, California

Before: PAEZ and SUNG, Circuit Judges, and FITZWATER,[**] District Judge.

Defendants Apple, Google, and Meta appeal, and Plaintiffs cross-appeal, the district court's consolidated order granting in part and denying in part Defendants' motions to dismiss Plaintiffs' three Master Complaints in three class action cases. We dismiss the appeal and cross-appeal for lack of jurisdiction.

Plaintiffs' Master Complaints allege that Defendants engage in unlawful conduct related to "social casino" applications and allege a total of 125 causes of action under the laws of 23 states and the United States. In the order at issue, the district court discussed three theories of liability and dismissed two of those theories on the ground that they are precluded by Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1). The district court *sua sponte* certified its order for interlocutory appeal under 28 U.S.C. § 1292(b). Defendants petitioned for permission to appeal the partial denial of the motion to dismiss, and Plaintiffs opposed the petition and conditionally cross-petitioned for permission to appeal the district court's dismissal of "theories" on the pleadings, as opposed to claims. A motions panel of this court granted the petition and conditional cross-petition. No. 22-80098 Dkt. 9; Nos. 22-80099, 22-80100 Dkt. 11. Because the district court's certified order does not qualify as an "order" under § 1292(b), we

---

[**] The Honorable Sidney A. Fitzwater, United States District Judge for the Northern District of Texas, sitting by designation.

lack jurisdiction to review it. Therefore, we vacate this court's order granting permission for the interlocutory appeal and cross-appeal as improvidently granted.

A denial of a motion to dismiss is a non-final order generally not subject to appeal. *See Couch v. Telescope Inc.*, 611 F.3d 629, 632 (9th Cir. 2010). Section 1292(b), however, provides a "narrow exception to the final judgment rule," *Couch*, 611 F.3d at 633, allowing a permissive interlocutory appeal when certain requirements are met:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b).

Although a motions panel granted the parties permission to appeal and cross-appeal under § 1292(b), we have an independent obligation to confirm that we have jurisdiction under § 1292(b). *ICTSI Oregon, Inc. v. Int'l Longshore & Warehouse Union*, 22 F.4th 1125, 1130–31 (9th Cir. 2022).

"An announcement by a trial court of its then opinion on an abstract question of law prior to the taking of final, definitive action affecting the substantial rights of the parties is not an 'order' under 28 U.S.C. § 1292(b) which will support an interlocutory appeal." *Nickert v. Puget Sound Tug & Barge Co.*, 480 F.2d 1039,

1041 (9th Cir. 1973).[1]

In its order, the district court deduced "three theories of liability" from the Master Complaints and concluded that the first and third theories—but not the second—were barred by Section 230. *See* 47 U.S.C. § 230(c)(1). The district court, however, did not apply its ruling to each of the 125 causes of action to determine which, if any, should be dismissed under Federal Rule of Civil Procedure 12(b)(6). The parties have yet to brief and the district court has yet to determine which causes of action should be dismissed. Thus, even though the certified order is characterized as a "dismissal order," it presents the district court's opinion on an abstract question of law without finally and definitively dismissing any claims. Consequently, it is not an "order" that supports jurisdiction under 28 U.S.C. § 1292(b). *Nickert*, 480 F.2d at 1041.

Were we to rule on the merits of the district court's dismissal of certain theories of liability, as the parties ask us to do, we would be issuing an advisory opinion. Section 1292(b) does not displace the prohibition against advisory opinions, which is "the oldest and most consistent thread in the federal law of justiciability." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 925 F.3d 1041,

[1] *See also* Wright & Miller, § 3930 Criteria for Permissive Appeal, 16 Fed. Prac. & Proc. Juris. § 3930 (3d ed.) ("The basic requirement for interlocutory appeal under § 1292(b) is that the district court have made an order. The statute does not contemplate that a district court may simply certify a question without first deciding it.").

1047 (9th Cir. 2019) (quoting *Flast v. Cohen*, 392 U.S. 83, 96 (1968)); *see also Benoit v. Saint-Gobain Performance Plastics Corp.*, 959 F.3d 491, 508 (2d Cir. 2020) ("Inherent in the requirements of section 1292(b) is that the issue in the certified order be ripe for judicial determination, because the purpose of section 1292(b) is not to offer advisory opinions rendered on hypotheses which evaporate in the light of full factual development." (cleaned up)).

Defendants urge us to reverse the district court's order as to the second theory of liability; they argue that we could avoid issuing an advisory opinion by dismissing the Master Complaints in their entirety. But doing so would not cure the advisory nature of such an opinion because we would still lack jurisdiction over the district court's order that dismisses theories, not claims. Rule 12(b)(6) permits dismissal for failure to state a claim. And Section 230 requires a claim-specific analysis.

To determine whether a particular claim should be dismissed under Section 230, a court must identify "the underlying legal duty" and determine whether "it seek[s] to hold the defendant liable as a 'publisher or speaker' of third-party content. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019) (citing *Doe v. Internet Brands*, 824 F.3d 846, 851, 853 (9th Cir. 2016)); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–09 (9th Cir. 2009), *as amended* (Sept. 28, 2009) (conducting claim-specific analysis). In doing so, the court must

consider what the underlying legal duty "actually requires." *Id*. at 682; *see also Internet Brands*, 824 F.3d at 850 ("The essential question . . . is whether [the p]laintiff's . . . cause of action 'inherently requires the court to treat' [the defendant] 'as a publisher or speaker' 'of information provided by another information content provider.'" (quoting *Barnes*, 570 F.3d at 1100–02)). A court may also need to consider other claim-specific issues, such as the source of the underlying duty. *Internet Brands*, 824 F.3d at 850–51 (considering source of duty to warn plaintiff). Disposition of the claims in this case will thus require examining each individual claim.

We are mindful that in complex cases involving many claims, a district court may decide to address pivotal threshold issues—such as the viability of certain legal theories—before applying its reasoning to specific claims. There is nothing wrong with such an approach, but we may not exercise jurisdiction under § 1292(b) until the district court has ruled on the claims at issue. Once the district court has done so, it may certify its order for interlocutory appeal.

Accordingly, we **VACATE** our December 13, 2022, order granting permission for an interlocutory appeal, **DISMISS** the cross-appeals for lack of jurisdiction, and **REMAND** to the district court.

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 13 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| In re: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION.<br><br>-----------------------------<br><br>JENNIFER ANDREWS; et al.,<br><br>Plaintiffs-Respondents,<br><br>v.<br><br>GOOGLE LLC; GOOGLE PAYMENT CORP,<br><br>Defendants-Petitioners. | No. 22-80098<br><br>D.C. No. 5:21-md-03001-EJD<br>Northern District of California, San Jose<br><br>ORDER |

Before: TASHIMA and S.R. THOMAS, Circuit Judges.

Respondents' motion to withdraw their motion to extend the time to answer the petition and to exceed page limits (Docket Entry No. 6) is granted. The motion to extend time and exceed page limits (Docket Entry No. 4) is withdrawn.

The motion for leave to file a reply in support of the petition (Docket Entry No. 8) is granted. The reply has been filed.

The petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) is granted. Respondents' conditional cross-petition is also granted. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (holding that under

§ 1292(b), "the appellate court may address any issue fairly included within the certified order because 'it is the order that is appealable, and not the controlling question identified by the district court.'" (citation omitted)).

The Clerk will open cross-appeals. Within 14 days after the date of this order, the parties shall perfect their respective appeals in accordance with Federal Rule of Appellate Procedure 5(d).

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

DEC 8 2022

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

In re: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION.

______________________________

KATHLEEN WILKINSON, individually and on behalf of all others similarly situated; et al.,

Plaintiffs-Respondents,

v.

FACEBOOK, INC., a Delaware corporation,

Defendant-Petitioner.

No. 22-80100

D.C. No. 5:21-cv-02777-EJD
Northern District of California,
San Jose

ORDER

Before: TASHIMA and S.R. THOMAS, Circuit Judges.

Respondents' motion to withdraw their motion to extend the time to answer the petition and to exceed page limits (Docket Entry No. 6) is granted. The motion to extend time and exceed page limits (Docket Entry No. 4) is withdrawn.

The motion for leave to file a reply in support of the petition (Docket Entry No. 8) is granted. The reply has been filed.

The petition for permission to appeal pursuant to 28 U.S.C. § 1292(b) is granted. Respondents' conditional cross-petition is also granted. *See Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996) (holding that under § 1292(b), "the appellate court may address any issue fairly included within the

certified order because 'it is the order that is appealable, and not the controlling question identified by the district court.'" (citation omitted)).

The Clerk will open cross-appeals. Within 14 days after the date of this order, the parties shall perfect their respective appeals in accordance with Federal Rule of Appellate Procedure 5(d).

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: APPLE INC. APP STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-02985-EJD<br>Re: Dkt. No. 92 |
| IN RE: GOOGLE PLAY STORE SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-md-03001-EJD<br>Re: Dkt. No. 69 |
| IN RE: FACEBOOK SIMULATED CASINO-STYLE GAMES LITIGATION | Case No. 5:21-cv-02777-EJD<br>Re: Dkt. No. 99<br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PURSUANT TO SECTION 230 OF THE COMMUNICATIONS DECENY ACT; *SUA SPONTE* CERTIFYING ORDER FOR INTERLOCUTORY APPEAL** |

In this putative class action, Plaintiffs allege that Defendants Apple, Google, and Facebook violate various state consumer protection laws by distributing game applications ("apps") that

operate as social casinos and thus permit illegal gambling. Defendants separately move to dismiss the complaints against them, arguing that they are immune from suit under Section 230 of the Communications Decency Act ("CDA"). Having considered the Parties' written submissions as well as the oral arguments of counsel presented at the hearing on August 4, 2022, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' respective motions to dismiss.

## I. BACKGROUND

Over the last decade, large social media companies and technology developers have turned their focus on developing applications or "apps." As relevant in this case, slot machine companies have partnered with technology companies to develop "social casino applications." Plaintiffs' Master Complaint[1] ("Compl.") ¶ 1, Dkt. No. 73. Social casinos are playable "apps" that can be accessed via smartphones, tablets, and internet browsers. These virtual casinos attempt to recreate an "authentic Vegas-style" slot-machine, gambling experience. Compl. ¶ 2.

The simulated social casino apps are designed to look like traditional casino games, such as slot machines, bingo, or craps. This seemingly makes social casinos apps addictive in the same way as "in-person" gambling. Compl. ¶¶ 3, 4. Indeed, the social casinos apps function much like in-person gambling. Users purchase virtual "chips" in exchange for real money. Compl. ¶ 3. Users then gamble those chips at slot machines games in hopes of winning "still more chips to keep gambling." Compl. ¶ 3. For example, in "DoubleDown Casino," players purchase "chip packages" costing up to $499.99, and then use those chips to play. Compl. ¶ 3. However, social casinos do not allow players to cash out their chips. Compl. ¶ 3. Instead, both purchased and "won" chips can only be used for more slot machine "spinning." Compl. ¶ 3. This makes the social casino apps "extraordinarily profitable and highly addictive." Compl. ¶ 4. One important distinction, however, is that social casino developers have access to big data, which allows them to

[1] For ease, the Court references the Master Complaint filed in the "Apple," 21-md-2985, docket as "Compl." and refers generally to that complaint, unless a specific citation to the other two complaints is needed.

identify, target, and exploit consumers prone to addictive behaviors. Compl. ¶ 4.

Plaintiffs allege that these social casino apps do not, and cannot, operate and profit at such a high level from these illegal games on their own. *See* Compl. ¶ 5 ("Their business of targeting, retaining, and collecting losses from addicted gamblers is inextricably entwined with the Platforms."). The Platforms "retain full control over allowing social casinos into their stores, and their distribution and promotion therein," and "share directly in a substantial portion of the gamblers' losses, which are collected and controlled by the Platforms themselves." Compl. ¶ 5; *see also* Compl. ¶ 6 ("Because the Platforms are the centers for distribution and payment, social casinos gain a critical partner to retain high-spending users and collect player data, a trustworthy marketplace to conduct payment transactions, and the technological means to update their apps with targeted new content designed to keep addicted players spending money."). Importantly, each complaint alleges that Apple, Facebook, and Google conspired with the social casino app developers to participate in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Compl. ¶¶ 16, 17, 489–521; Google Complaint ¶¶ 16, 17, 505–37, Dkt. No. 52; Facebook Complaint ¶¶ 16, 17, 467–99, Dkt. No. 80.

**A. Offering, Categorizing, and Promoting of the Social Casino Apps**

Each year, consumers buy billions of dollars of online casino chips from the Platforms. The Platforms help the social casino app developers target consumers to maximize revenue. Compl. ¶ 87. "For instance, [Defendant] Apple provides marketing guidance, tools, promotional offers, and more to app developers (like the developers of the Illegal Slots) to help drive users' discovery of apps and in-app purchases." Compl. ¶ 87; *see also* Google Complaint ¶ 85; Facebook Complaint ¶¶ 71, 171 ("Underlying our paid marketing efforts are our *data analytics* that allow us to estimate the expected value of a player and adjust our user acquisition spend to a targeted payback period." (emphasis added)). Defendant Apple selects apps to "feature" within its App Store, which "increases app installs." Compl. ¶ 88. Google "offers App Campaigns to promote apps on Google Search, YouTube, Google Play, and more." Google Complaint ¶ 85.

Likewise, Facebook uses tools like "targeted ads" and "in-game rewards" to encourage new users to play social casinos. Facebook Complaint ¶ 80.

Defendant Apple has publicly acknowledged its active participation in the creation of app content, stating that the commissions it charges on all App Store sales reflect the value of the "tools and software for the development, testing and distribution of developers' apps, and digital content" that it provides. Compl. ¶¶ 90, 92–97; *see also* Google Complaint ¶¶ 90, 91 ("The data that the Illegal Slot companies and the Platforms collect on monetization necessarily contribute to the structure and success of the Social Casino Enterprise.").

**B. Booking Fees**

The Platforms also "operate[] as the payment processor for all in-app purchases of virtual chips in the Illegal Slots. [The Platforms] collect[] the money players spend on virtual chips, take[] a cut for itself, and remit[] the rest to the Illegal Slots." Compl. ¶ 63; Facebook Complaint ¶ 60; Google Complaint ¶ 61. Plaintiffs argue that although the Platforms "do not determine the odds of winning any slot machine spins within the apps, they otherwise act much like the bookmakers in gambling parlance: accepting players' real money, provisioning casino chips to be wagered on illegal slot machine games, earning 30% of the gross sales for their contribution to the enterprise, and sometime later remitting the purchase amount (net of their fee) to the gambling game developers." Plaintiffs' Consolidated Opposition to CDA 230 Motions to Dismiss ("Opp.") at 5, Dkt. No. 104. When players run out of chips, they cannot continue playing the same slot machine game unless they purchase more chips. Compl. ¶¶ 61–63; Facebook Complaint ¶¶ 58–60; Google Complaint ¶¶ 59–61.

Virtual chips cannot be used outside of an individual Illegal Slots app. "The chips can only be used to (1) place wagers on slot machine spins, (2) place wagers on the few card game or bingo titles in the Illegal Slots app, or (3) give a "gift" of virtual chips to another account in the app. Substantially all virtual chips are used on slot machine spins." Compl. ¶ 65; Facebook Complaint ¶ 62; Google Complaint ¶ 63. As alleged by Plaintiffs, because the challenged apps

United States District Court
Northern District of California

derive most of their revenue from slot machine games, it is "substantially certain" that when a user buys virtual chips from the Platforms within a social casino app, those chips will be used to wager on a slot machine spin. Compl. ¶ 56; Facebook Complaint ¶ 53; Google Complaint ¶ 54.

**C. Targeted Advertising**

Plaintiffs allege that the Platforms are closely involved in social casinos' business strategies. For example, the Platforms and developers work together to "monitor the game activity and use the collected data to increase user spending." Compl. ¶ 91; Facebook Complaint ¶ 81; Google Complaint ¶ 88. Because the Platforms handle all payment processing for the social casinos, the developers often only have access to user data from the Platforms. Compl. ¶ 91; Facebook Complaint ¶ 81; Google Complaint ¶ 88. The Platforms and developers also "work together to target and exploit high-spending users, or 'whales.'" Compl. ¶ 92; Facebook Compliant ¶ 82; Google Complaint ¶ 89. For example, Apple "aids in the design and direction of targeted advertising, both on and within its App Store and other related Apple platforms, all aimed at driving new customers to [socials casinos] and retaining current gamblers." Compl. ¶ 94. Facebook provides "App Ads [which] allow Illegal slot companies to target high spending users and activate non-spending users." Facebook Complaint ¶ 84. Facebook also "sends targeted ads offering in-game rewards to users who invite their Facebook friends to play the [social casinos], and provides online "tournaments" which "driv[es] . . . chip sales." Facebook Complaint ¶ 80. Google "aids in the design and direction of targeted advertising, both on Google.com, its larger Display Network, and within other apps and platforms, all aimed at driving new customers to the [social casinos] and retaining current gamblers." Google Complaint ¶ 91.

**D. Claims Asserted**

Plaintiffs assert multiple claims against the Platforms. For instance, Plaintiffs pursue comparable claims under California, Alabama, Georgia, Connecticut, Illinois, Indiana, Minnesota, Mississippi, Missouri, New Mexico, New York, Ohio, and Oregon (among other states). These claims are similar—Plaintiffs pursue claims under unfair competition laws, unjust enrichment,

illegal gambling and/or gambling loss laws. Importantly, the claims are asserted against the Platforms themselves. For example, Count I alleges that by hosting Illegal Slots within the meaning of California Penal Code § 330, Apple engaged in unfair competition within the meaning of California Business and Professions Code § 17200 by committing unlawful, unfair and fraudulent business acts and practices. *See* Compl. ¶¶ 148–71. Count II alleges, by hosting Illegal Slots, Apple was unjustly enriched to the detriment of Plaintiffs and profited immensely by providing marketing guidance, tools, and other assistances to the developers of social casinos and retaining a percentage of the money spent by consumers in social casinos. *See* Compl. ¶¶ 172–78. Count III alleges, by actively participating in the operation of social casinos by providing market guidance and helping create and develop the social casinos, Apple violated Alabama Code § 8-1-150(a). *See* Compl ¶¶ 179–86. Plaintiffs' claims of unfair competition, gambling violations, and unjust enrichment thus pursue the Platform's *individual* acts, not the acts of third-parties.

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating a Rule 12(b)(6) motion, the district court is limited to the allegations of the complaint, documents incorporated into the complaint by reference, and matters which are subject to judicial notice. *See La. Mun. Police Emps.' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

United States District Court
Northern District of California

### III. DISCUSSION

The Platforms seek dismissal of the complaints filed against them without leave to amend, arguing that they are immune from suit under Section 230 of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230. *See* Apple Inc.'s Notice of Motion and Rule 12(b)(6) Motion to Dismiss Based on Immunity Pursuant to Section 230 of the Communications Decency Act ("Apple MTD"), Dkt. No. 92; Defendants Google LLC and Google Payment Corp.'s Motion to Dismiss Master Complaint Under Section 230 of the Communications Decency Act ("Google MTD"), Dkt. No. 69; Motion of Defendant Meta Platforms, Inc. to Dismiss Complaint Under Section 230 of the Communications Decency Act ("Facebook MTD"), Dkt. No. 99. Plaintiffs disagree, arguing that Section 230 of the CDA does not apply to the case at hand.

Section 230 of the CDA "protects certain internet-based actors from certain kinds of lawsuits." *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096, 1099 (9th Cir. 2009). As relevant here, Section 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). "The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quotation marks and citation omitted).

By its terms, section (c)(1) ensures that in *certain* cases, an internet service provider is not "treated" as the "publisher or speaker" of third-party content. Thus, Section 230's grant of immunity applies "only if the interactive computer service provider is not also an 'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of" the offending content. *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (quoting 47 U.S.C. § 230(f)(3)). "The

prototypical service qualifying for [CDA] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (alteration in original) (quoting *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016)); *see also Doe v. Internet Brands, Inc.*, 824 F.3d 846, 850 (9th Cir. 2016) ("In general, [Section 230] protects websites from liability for material posted on the website by someone else.").

In *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009), the Ninth Circuit created a three-prong test for Section 230 immunity. "Immunity from liability exists for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" *Dyroff*, 934 F.3d at 1097 (quoting *Barnes*, 570 F.3d at 1100–01). "When a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's claims should be dismissed." *Id.*

Importantly, and as will be demonstrated below, to assess these factors, the court must analyze how much control a website exercised over the offensive content. Practically speaking, the second and third factor tend to overlap in significant ways. The question of whether a plaintiff seeks to treat an interactive computer service as a publisher or speaker of third-party information (the second *Barnes* element) interacts in obvious ways with the question of whether the information provided is the information of a third-party (the third *Barnes* element). For instance, in *Fair Housing Valley Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) (en banc), liability turned on the website's prompts, which required users to create profiles that violated the Fair Housing Act. The website was not behaving as a "publisher or speaker" of third-party information, as it was publishing illegal content that it itself had elicited from others. It is for this reason that the Court also looks to the third element of *Barnes*, even while this action only concerns the second element of *Barnes*.

United States District Court
Northern District of California

To determine whether Section 230 immunity applies, this Court must decide whether Plaintiffs' theory of liability would treat the Platforms as a publisher or speaker of third-party content. There is no dispute that prongs one and three are satisfied. Rather, Plaintiffs dispute the applicability of the second prong and argue that the second prong is not applicable because Plaintiffs seek to hold the Platforms liable for their own conduct.

**A. The History of Section 230 CDA Immunity**

Title V of the Telecommunications Act of 1996, Pub. L. No. 104-104, is known as the "Communications Decency Act of 1996" (the "CDA" or "the Act"). Its primary purpose was to "reduce regulation and encourage the rapid deployment of new telecommunications technologies." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 857 (quotation marks omitted).

Section 230 was first offered as an amendment by Representatives Christopher Cox and Ron Wyden (*i.e.*, the "Cox-Wyden Amendment"). *See* 141 Cong. Rec. H8460-01 (Aug. 4, 1995). The primary goal of the amendment was to control the exposure of minors to indecent materials, specifically pornography, by immunizing interactive service providers that voluntarily censor offensive content posted on their sites. *Id.* It is for this reason that Section 230(c), the section of the amendment at issue, provides protection for "good Samaritan" blocking and screening of offensive material. *See* 47 U.S.C. § 230(c) (entitled "Protection for 'Good Samaritan' Blocking and Screening of Offensive Material"). Pursuant to 47 U.S.C. § 230(c)(2):

> No provider or user of an interactive computer service shall be held liable on account of—
>
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, or otherwise objectionable, whether or not such material is constitutionally protected; or
>
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

United States District Court
Northern District of California

By its plain language, Section 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, Section 230 precludes courts from entertaining claims that would place an interactive service provider in a publisher's role. A lawsuit that seeks to hold a provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content—are barred. This advances three purposes: protecting freedom of speech on the Internet, removing disincentives to voluntary private censorship, and encouraging the development of Internet commerce generally. *See Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1103 (N.D. Cal. 2011) ("A principal purpose of the CDA is to encourage interactive service providers to engage in effective self-regulation of certain content. The Ninth Circuit has recognized that § 230 of the statute is 'designed . . . to promote the free exchange of information and ideas over the internet and to encourage voluntary monitoring for offensive and obscene material.'" (quoting *Barnes*, 570 F.3d at 1099–1100)); *see also Green v. Am. Online (AOL)*, 318 F.3d 465, 472 (3d Cir. 2003) ("Section 230(c)(2) does not *require* AOL to restrict speech; rather it allows AOL to establish standards of decency without risking liability for doing so."); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *Force v. Facebook Inc.*, 934 F.3d 53, 76 (Katzmann, C.J., concurring in part, dissenting in part) (analyzing the history of Section 230 and concluding that Section 230(c)(1) need not be interpreted to immunize websites' friend-and content-suggestion algorithms).

The legislative history of the Cox-Wyden Amendment makes clear that Congress enacted section 230 to remove the disincentives to self-regulation created by a New York state court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). There, the plaintiffs sued Prodigy, an interactive computer service provider, for defamatory comments made by an unidentified party on one of Prodigy's bulletin boards. The Court held Prodigy to the strict liability standard normally applied to original publishers of defamatory statements, reasoning that Prodigy acted more like an original publisher than a

distributor both because it advertised its practice of controlling content on its service and because it actively screened and edited messages posted on its bulletin boards.

The Cox-Wyden Amendment sought to remove the disincentives to self-regulation created by the *Stratton Oakmont* decision. *See* 141 Cong. Rec. H8460-01 at 8469 (Aug. 4, 1995) ("Mr. Chairman, [the *Stratton Oakmont*] is backward. We want to encourage people like Prodigy . . . to do everything possible for us, the customer, to help us control, at the portals of our computer, at the front door of our house, what comes in and what our children see."). Fearing that the specter of liability would deter service providers from blocking and screening offensive material, Congress enacted Section 230's broad immunity "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4). Section 230 also recognizes that interactive computer services offer a "forum for true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* § 230(a)(1). It is the goal of Section 230 to preserve allow this "vibrant and competitive free market" to develop "unfettered by Federal or State regulation." *Id.* § 230(b)(2).

Section 230 advanced an additional interest: to eliminate any chilling effect that tort liability would have on interactive service providers. Interactive computer services have millions of users. An immense amount of information is thus both posted and communicated on interactive sites. The imposition of tort liability would chill, if not eliminate, interactive service providers. It would be impossible for service providers to screen each of their millions of postings for possible problems. *Zeran*, 129 F.3d at 331. Such a responsibility would likely cause interactive service providers to severely restrict the number and type of messages posted, something that the CDA is expressly against. *See Reno*, 521 U.S. at 857 ("[The Act's] primary purpose was to reduce regulation and encourage the rapid deployment of new telecommunications technology." (quotation marks omitted)). In enacting Section 230, Congress chose to immunize service

providers to avoid any restriction of interactive computer service providers' passive hosting of third-party speech. Accordingly, Section 230 sought to accomplish two objectives. Its broad grant of immunity both reduces obscenity on the Internet, by incentivizing service providers to review third-party content without fear of retribution, and precludes government censorship, by expressly barring service providers to be held liable for the speech of another. *See Batzel*, 333 F.3d at 1027–28.

**B. Analysis of Section 230 CDA Immunity**

The dispositive question in this case is whether the Platforms were "publishers or speakers" within the meaning of 47 U.S.C. § 230(c)(1). As established, through section 230, Congress granted most Internet services immunity from liability for publishing third-party material. To understand the boundaries of this immunity, the Court reviews several cases that have wrestled with the applicability of section 230 immunity. In doing so, the Court examines the motivations of section 230 and how these motivations interact with the holdings of this Circuit's case law. While this review is lengthy, it is important to understand how section 230 has evolved and whether it applies to the facts of this case. There is no doubt that the Internet of 1996, which boasted platforms that hosted "bulletin board" type websites, has changed. In examining this Circuit's case law, the Court attempts to understand the evolution of section 230 precedent and how that precedent has responded to the rapid and unforeseen changes to the Internet.

**1. *Batzel v. Smith***

In *Batzel v. Smith*, the defendant, Ton Cremers, ran the Museum Security Network, which maintained a website and distributed an email newsletter via Listserv software. 333 F.3d 1018 (9th Cir. 2003) *superseded in part by statute on other grounds as stated in Breazeale v. Victim Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017). A handyman, Robert Smith, worked for Ellen Batzel at her home. *Id.* at 1020. Batzel told Smith that she was the granddaughter of one of Adolf Hitler's right-hand men. *Id.* at 1020–21. Batzel also told him that the paintings in her home were inherited. *Id.* at 1021. After "assembling these clues," Smith emailed the Museum Security

Network, alleging that the painting in Batzel's home were looted during World War II based in part on Batzel's statements to him that she was a descendant of a Nazi and inherited the art. After making "some minor wording changes," Cremers posted the email on the network and sent it by a listserv to subscribers (including museum security investors, insurance investigators, and law-enforcement investigators, who use the network to track down stolen art). *Id.* at 1021–22. Batzel discovered the message and complained to the network operator, and ultimately sued Cremers, the network operator, the museum, and a security firm that advertised on the network "to redress her claimed reputational injuries." *Id.* at 1022.

Among other questions, the court examined whether Cremers was merely a "provider or user" of the Listserv, or rather an "information content provider," who "created" or "developed" the actionable content. *Id.* at 1031. The majority held that Cremers's minor alterations of Smith's email prior to its posting and his choice to publish the email, while rejecting others, did not make Cremers a co-information service provider. *Id.*; *see also* 47 U.S.C. § 230(f)(3) (defining "information content provider" to mean "any person or entity that is responsible, in whole or in part, for the *creation or development of information* provided through the Internet or any other interactive computer service" (emphasis added)). The "development of information" means "something more substantial than merely editing portions of an e-mail and selecting material for publication." *Id.* Because Cremers did no more than select and make minor alterations to Smith's email, Cremers was not the content creator or provider of Smith's email for Section 230 purposes. *Id.* The partial dissent diverged, arguing that immunity should not apply where a defendant has taken "an active role in selecting" information. *Id.* at 1040 (Gould, J., concurring in part and dissenting in part) ("I would hold that Cremers is *not* entitled to CDA immunity because Cremers actively selected Smith's e-mail message for publication.").

While the majority and dissent reached different outcomes, they agreed that the relevant question in distinguishing "provider or user" from "information content provider" was the degree of editorial control exercised. Both focused on the degree of editorial control exercised and

analyzed *what degree* of control is necessary to grant or deny immunity. For the majority, Cremers behaved like a publisher, acting with typical editorial discretion in deciding whether to publish or not. *See id.* at 1032 ("The scope of the immunity cannot turn on whether the publisher approaches the selection process as one of inclusion or removal, as the difference is one of method or degree, not substance."). In the majority's view, it would be nonsensical that Section 230 would not apply when its very purpose was to enable interactive computer providers to censor certain posts with impunity. *Id.* For the dissent, the discretion made Cremers a co-author as the discretion added Cremers' "imprimatur to [the email]." *Id.* at 1038 (Gould, J., dissenting). In the dissent's view, this advanced Congress's goal of encouraging providers to not publish offensive materials by requiring publishers, on the front end, to "filter" out obscene or offensive materials. *Id.* at 1040. Importantly, both the majority and the dissent's opinions contain a key principle—the question of whether immunity applies requires an analysis of what Section 230 sought to accomplish. Under the holding of *Batzel*, providing online intermediaries immunity for their inevitable (and editorial) responsibility of choosing which content to post, and for minor edits to that content, advances the twin aims of Section 230: it promotes a robust exchange of information and ideas over the Internet, while still encouraging platforms to voluntarily monitor their websites for third-party content that is offensive or obscene. *Id.* at 1026–30.

**2. *Carafano v. Metrosplash.com, Inc.***

In *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1120 (9th Cir. 2003), the court considered "to what extent a computer match making service may be legally responsible for false content in a dating profile provided by someone posing as another person." There, an unidentified prankster placed a fraudulent personal ad on Matchmaker.com, a date matching website. *Id.* at 1121. To create a profile, members must complete a "detailed questionnaire containing both multiple-choice and essay questions." *Id.* The imposter created a profile for the plaintiff, Christianne Carafano. *Id.* Carafano, a popular actress, did not know of, consent to, or permit the posting of the profile. *Id.* The profile claimed that Carafano was looking for a "one-night stand"

with a "hard and dominant" man with "a strong sexual appetite." *Id.* The profile used a contact email address, which when contacted, produced an automatic email reply that provided Carafano's home address and telephone number. *Id.* Carafano soon began receiving inappropriate voicemails, and when she returned home, she found a highly threatening and sexually explicit fax that also threatened her son. *Id.* Carafano ultimately learned of the profile, and sued Matchmaker.

The court held that Section 230 barred Carafano's claims for two reasons. First, the dating service was not the "information content provider" for the profiles on its website. *Id.* at 1124. "The fact that some of the content was formulated in response to Matchmaker's questionnaire does not alter this conclusion." *Id.* While the questionnaire facilitated the expression of information by individual users, the "selection of the content was left exclusively to the user." *Id.* The users, and not the website, were the "information content providers" because the users decided how to answer the questions provided. *Id.* That the website classified user characteristics into discrete categories and collected responses to specific essay questions did not transform the website into a "developer" of the "underlying information." *Id.* (citing *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816 (2002)). Thus, the website could not "be considered an 'information content provider' under the [CDA] because no profile ha[d] any content until a user actively create[d] it." *Id.* at 1124. Second, even if the dating services could be considered a content provider for publishing its customer's profiles, it was exempt from liability because it did not "create[] or develop[] the particular information at issue." *Id.* at 1125. The anonymous user entered the "critical information" (*i.e.*, Carafano's home address, movie credits, and the email address that revealed her phone number). *Id.* Likewise, the anonymous user created the profile with the sexually suggestive comments, "none of which bore more than a tenuous relationship to the actual questions asked." *Id.* Thus, the website did not play a "significant role in creating, developing, or 'transforming' the relevant information." *Id.*

Much like *Batzel*, the court's inquiry focuses on the degree of control that the interactive computer service has over the content at issue. Importantly, the third-party provided information that was not solicited by the operator of the website. Indeed, Matchmaker's prompts sought information about the preparer of the profile—the individual answering the prompts—not about unwitting third parties. The questions neither suggested, encouraged, or solicited posting sensitive and personal information about another person, nor suggested, encouraged, or solicited the explicit information provided. In fact, the information as provided *despite* the website's rules and policies. Accordingly, immunity turned on the degree of control that Matchmaker exercised over the content generated on its website. Because Matchmaker was "neutral," in that it did not directly elicit the defamatory, private, or otherwise tortious or unlawful information at issue, it was immune under Section 230.

### 3. *Fair Housing Council of San Fernando Valley v. Roommates.com*

In *Fair Housing Valley Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1161 (9th Cir. 2008) (en banc), the court "plumb[ed] the depths of immunity provided by section 230 of the [CDA]." There, the defendant, Roomates.com, operated an online roommate-matching service that was designed to match people renting out spare rooms with people looking for a place to live. *Id.* Before subscribers could search listings or post housing opportunities on Roommate's website, they had to create profiles, a process that required them to answer a series of questions. *Id.* "In addition to requesting basic information—such as name, location and email address—Roommate requires each subscriber to disclose his sex, sexual orientation and whether he would bring children to a household." *Id.* Each subscriber also had to describe "his preference[] in roommates with respect to the same three criteria: sex, sexual orientation, and [children]." *Id.* The site also encouraged subscribers to provide "Additional Comments" describing themselves and their desired roommate in an open-ended essay. *Id.* After a new subscriber completed the application, Roommate assembled his answers into a "profile page," which displayed the "subscriber's pseudonym, his description and his preferences." *Id.* at 1162.

The Fair Housing Councils of the San Fernando Valley and San Diego ("the Councils") sued Roommate, alleging that Roommate's business violated the federal Fair Housing Act ("FHA") and California housing discrimination laws. *Id.* Roommate argued it was immune from suit under Section 230 of the CDA.

Using *Carafano* as a point of contrast, the *Roommates* court held that because Roommates.com had "materially contributed" to the unlawfulness of the content under the Fair Housing Act, it had "developed" the content within the meaning of CDA § 230(c)(1). *Id.* at 1167–68. "Here, the part of the profile that is alleged to offend the [FHA] and state housing discrimination laws—the information about sex, family status and sexual orientation—is provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services." *Id.* at 1166. By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate became more than a passive transmitter of information provided by others; it became the developer, at least in part, of that information. *Id.* "The CDA does not grant immunity for inducing third parties to express illegal preferences. Roommate's own acts—posting the questionnaire and requiring answers to it—are entirely its doing and thus section 230 of the CDA does not apply . . . . Roommate is entitled to no immunity." *Id.* at 1165.

The court further held that Roommate was not entitled to CDA immunity for the operation of its search system, which filtered listings, or its email notification system, which directed emails to subscribers according to discriminatory criteria. *Id.* at 1167. Roommate developed its search system, so it would steer users based on the preferences and personal characteristics that Roommate forced subscribers to disclose. *Id.* "If Roommate has no immunity for asking the discriminatory questions, . . . it can certainly have no immunity for using the answers to the unlawful questions to limit who has access to housing." *Id.* Unlike search engines like Google, Yahoo!, or MSN, the Roommate search system used unlawful criteria to limit search results. As alleged in the complaint, Roommate's search was designed to make it harder, if not impossible,

United States District Court
Northern District of California

for individuals with certain protected characteristics to find housing—something the law prohibits. *Id.* In contrast, ordinary search engines are not developed to limit the scope of searches conducted on them and are not designed to achieve illegal ends. *Id.* Thus, such search engines "play no part in the 'development' of any unlawful searches." *Id.* (citing 47 U.S.C. § 230(f)(3)). Liability only attaches where a "website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Id.* at 1168.

The *Roommates* court analyzed its opinion in the context of *Batzel* and *Carafano*. Regarding *Batzel*, the court wrote

> The distinction drawn by Batzel anticipated the approach we take today. As Batzel explained, if the tipster tendered the material for posting online, then the editor's job was, essentially, to determine whether or not to prevent its posting—precisely the kind of activity for which section 230 was meant to provide immunity. *And any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230.* But if the editor publishes material that he does not believe was tendered to him for posting online, then he is the one making the affirmative decision to publish, and so he contributes materially to its allegedly unlawful dissemination. He is thus properly deemed a developer and not entitled to CDA immunity. *See Batzel*, 333 F.3d at 1033.

*Roommates.com*, 521 F.3d at 1171 (emphasis added) (citations omitted).

Regarding *Carafano*, the court attempted to clarify "the reasoning undergirding" the holding, which was "unduly broad." *Id.*

> In *Carafano*, . . . . [w]e correctly held that the website was immune, but incorrectly suggested that it could never be liable because "no [dating] profile has any content until a user actively creates it." . . . . [A] website operator may still contribute to the content's illegality and thus be liable as a developer. Providing immunity every time a website uses data initially obtained from third parties would eviscerate the exception to section 230 for "develop[ing]" unlawful content "in whole or in part."
>
> We believe a more plausible rationale for the unquestionably correct result in Carafano is this: The allegedly libelous content there—the false implication that Carafano was unchaste—was created and developed entirely by the malevolent user, without prompting or help from the website operator. To be sure, the website provided neutral tools, . . . but the website did absolutely nothing to encourage the

> posting of defamatory content . . . . The claim against the website was, in effect, that it failed to review each user-created profile to ensure that it wasn't defamatory. *That is precisely the kind of activity for which Congress intended to grant absolution with the passage of section 230*. With respect to the defamatory content, the website operator was merely a passive conduit and thus could not be held liable for failing to detect and remove it.

*Roommates.com*, 521 F.3d at 1171–72 (emphasis added) (citations and footnote omitted).

*Roommates.com* makes clear that Section 230 immunity is premised on the activity of a website in eliciting the content at issue. If a website encourages or aids in the production of illegal content, the website cannot be said to be "neutral," and instead is properly said to be an "active" co-developer. By sharp contrast, if a website simply provides neutral tools, specifically designed to accomplish a benign objective, the website cannot be said to be a co-developer of illicit content. Again, at the heart of this logic is a simple understanding of what Section 230 sought to promote—free speech and fearless monitoring by websites. *See id.* at 1169 (contrasting the case with *Stratton Oakmont* and noting that "Rooomate is not being sued for removing some harmful messages while failing to remove others; instead, it is being sued for the predictable consequences of creating a website designed to solicit and enforcing housing preferences that are alleged to be illegal"). Indeed, the CDA, specifically Section 230, "was not meant to create a lawless no-man's-land on the Internet." *Id.* at 1164.[2]

**4. *Barnes v. Yahoo!, Inc.***

In *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009), the Court decided "how to determine when, for purposes of [Section 230], a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content." There, the plaintiff, Cecilia Barnes, sued Yahoo after it failed to take down fraudulent profiles that has been created by her ex-boyfriend. Barnes broke off a lengthy relationship with her boyfriend. He responded by posting

[2] Importantly, the majority held that immunity applied to the "Additional Comments" section of profile pages because Roommate did "not provide any specific guidance" or "urge subscribers to input discriminatory preferences" in this section. *Roommates.com*, 521 F.3d at 1173 ("This is precisely the kind of situation for which section 230 was designed to provide immunity.").

profiles of her on a website run by Yahoo. The profiles contained nude photographs of Barnes and her boyfriend, taken without her knowledge, and open solicitation to engage in sexual intercourse. The ex-boyfriend, posing as Barnes, "chatted" with male correspondents in chat rooms. "Before long, men whom Barnes did not know were peppering her office with emails, phone calls, and personal visits, all in the expectation of sex." *Id.* at 1098. Barnes asked Yahoo to remove the profiles. Eventually, Yahoo promised it would take care of the profiles. Approximately two months passed without word from Yahoo, at which point Barnes filed this lawsuit against Yahoo in state court. Shortly thereafter, the profiles disappeared. Barnes pursued two theories of liability: (1) Yahoo negligently provided or failed to provide services that it undertook to provide and (2) Yahoo made a promise to her to remove the profiles but failed to do so. *Id.* at 1099. Yahoo moved to dismiss the action, contending that Section 230(c)(1) rendered it immune from liability.

The Ninth Circuit created a three-prong test for Section 230 immunity. *Id.* at 1100. "[I]t appears that subsection(c)(1) only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Id.* at 1100–01 (footnote omitted). There was no dispute that Yahoo is a provider of an interactive computer service, and there was no dispute that the "information content" at issue was provided by another "information content provider." *Id.* at 1101. Thus, the "flashpoint" of the case was "the meaning of the 'publisher or speaker' part of subsection (c)(1)." *Id.*

The court first noted that Section 230 is not limited to defamation cases. *Id.*

> [W]hat matters is not the name of the cause of action—defamation versus negligence versus intentional infliction of emotional distress—what matters is whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another. *To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a "publisher or speaker."* If it does, section 230(c)(1) precludes liability.

*Id.* at 1101–02 (emphasis added); *see also id.* at 1102 (citing *Roommates.com*, 521 F.3d at 1170–71 and *Zeran*, 129 F.3d at 330 for support that "a publisher reviews material submitted for publication, perhaps edits it for style or technical fluency, and then decides whether to publish it").

The court determined that Yahoo was entitled to Section 230 immunity for Barnes's negligence claim, but not for her promissory estoppel claim. *Id.* at 1105, 1109. The negligence claim was based on Oregon law, which provided that one who undertakes to render services to another may be subject to liability from his failure to exercise reasonable care in that undertaking. *Id.* at 1102. Barnes argued that this theory "treat[ed] Yahoo not as a publisher, but rather as one who undertook to perform a service and did it negligently." *Id.* The court rejected this argument, concluding that Barnes could not "escape section 230(c) by labeling as a 'negligent undertaking' an action that is quintessentially that of a publisher." *Id.* at 1103. The court noted that the undertaking Yahoo allegedly failed to perform was the removal of the profiles from its website, an action that is quintessentially that of a publisher. "In other words, the duty that Barnes claims Yahoo violated derives from Yahoo's conduct as a publisher—the steps it allegedly took, but later supposedly abandoned, to de-publish the offensive profiles." *Id.* Because the choice, to publish or de-publish "can be boiled down to deciding whether to exclude material that third parties seek to post online," is paradigm publishing conduct, section 230(c)(1) barred the claim. *Id.* (quoting *Roommates.com*, 521 F.3d at 1170–71)).

Regarding the promissory estoppel claim, the court determined that Section 230 did not apply. *Id.* at 1109. Observing that promissory estoppel "is a subset of a theory of recovery based on a breach of contract, the court concluded that "Barnes does not seek to hold Yahoo liable as a publisher or speaker of third-party content, but rather as the counter-party to a contract, as a promisor who has breached." *Id.* at 1106–07. The court explained that "[c]ontract liability here would come not from Yahoo's publishing conduct, but from Yahoo's manifest intention to be legally obligated to do something, which happens to be removal of material from publication." *Id.* at 1107.

Critically, *Barnes* advances the underlying goals of Section 230. If Yahoo were found liable for negligent undertaking, there would be no way to distinguish it from a situation where someone attempts to hold a website liable for failing to remove inappropriate or defamatory content. This is exactly what Section 230 seeks to avoid. It immunizes interactive computer services for third-party offensive content. Here, Barnes's ex-boyfriend, the third party, posted inappropriate content on Yahoo, an interactive computer service. Barnes seeks to hold Yahoo liable for its negligent failure to remove the content. This is no different from *Stratton Oakmont*. It is for this reason that Yahoo's failure to remove the profiles was protected. It acted as an editor in deciding whether to withdraw the ex-boyfriend's content. *See id.* at 1102 ("[P]ublication involves reviewing, editing, and deciding whether to publish or withdraw from publication third-party content.").

**5. *Doe v. Internet Brands, Inc.***

In *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), the court answered whether it would be inconsistent with Section 230(c)(1) for the State of California to require an interactive service provider to warn its users about the threat of a known sexual predator. There, the plaintiff, Jane Doe, was an aspiring model who posted information about herself on modelmayhem.com, a website owned by the defendant Internet Brands. Unbeknownst to Doe, two persons were using the website to identify targets for a rape scheme. The two people did not have their own profiles, they instead browsed profiles posted by models, contacted potential victims with fake identities posing as talent scouts, and lured the victims to south Florida for modeling auctions. *Id.* at 848. Once a victim arrived, the two people used a date rape drug to put her in a semi-catatonic state, raped her, and recorded the activity on videotape for sale and distribution as pornography. *Id.* Internet Brands purchased the website in 2008.

Shortly after the purchase, Internet Brands learned of how the two people were using the website. *See id.* at 849 ("As early as August, 2010, knew that two individuals, . . . had been criminally charged in this scheme, and further knew from the criminal charges, the particular

United States District Court
Northern District of California

details of the scheme, including how MODELMAYHEM.COM had been used in the scheme and its members victimized."). In February 2011, several months after Internet Brands had learned about the criminal activity, the two people lured Doe to South Florida for a purported audition, where she was drugged, raped, and recorded. *Id.* Doe filed suit, asserting one count of negligent failure to warn. Internet Brands moved to dismiss, arguing that it was entitled to immunity under Section 230.

The court held that the CDA did not provide immunity against Plaintiff's negligent failure to warn claim. Unlike cases like *Carafano* and *Barnes*, Doe did not seek to hold Internet Brands liable as a "publisher or speaker" of content posted by a third-party on the Model Mayham website. The action did not turn on Internet Brands' monitoring or editing of its website. Instead, it turned on Internet Brands failure to warn Doe about information it obtained from an outside source. The duty to warn imposed by California law thus did not implicate Internet Brands' role as an editor or publisher of third-party content. *Id.* at 851.

*Internet Brands* demonstrates that courts must carefully analyze a claimant's cause of action to determine if the action reaches the website's editorial functions. It also expresses limitations on section 230's scope. It is not enough that an interactive computer service be incidentally involved. Section 230(c)(1)'s purposes support this analysis. *Id.* The immunity provision was meant to protect websites against liability for failure to remove offensive content to promote free speech *and* to incentivize websites to self-monitor without fear that more liability will be imputed onto them. Doe's failure to warn claim "has nothing to do with Internet Brands' efforts, or lack thereof, to edit, monitor, or remove user generated content." *Id.* at 852. Critically, the court centered its decision around section 230's core purposes, while noting that "Congress has not provided an all-purpose get-out-of-jail-free card for businesses that publish user content on the internet, though any claims might have a marginal chilling effect." *Id.* at 853.

United States District Court
Northern District of California

**6. *HomeAway.com, Inc. v. City of Santa Monica***

In *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019), Santa Monica attempted to manage the disruptions brought about by the rise of short-term rentals facilitated by innovative startups like HomeAway.com, Inc., and Airbnb.com by passing an ordinance regulating the short-term vacation rental market. The ordinance prohibited most types of short-term rentals, except for licensed home-shares. The ordinance imposed four obligations on hosting platforms directly. It required them to (1) collect and remit "Transient Occupancy Taxes," (2) disclose certain listing and booking information regularly, (3) refrain from completing any booking transaction for properties not licensed and listed on the City's registry, and (4) refrain from collecting or receiving a fee for "facilitating or providing services ancillary to a vacation rental or unregistered home-share." *Id.* at 680. HomeAway argued it was immune from suit under Section 230 of the CDA.

Only the second *Barnes* element was at issue in *HomeAway*. The court thus centered its analysis on whether the Ordinance treated HomeAway as a "publisher or speaker" in a manner that is barred by the CDA. *Id.* at 681. HomeAway argued that Section 230 preempted the ordinance because the ordinance implicitly required them to "monitor the content of a third-party listing and compare it against the City's short-term rental registry before allowing any booking to proceed." *Id.* at 682. Relying on *Internet Brands*, HomeAway argued that CDA immunity follows whenever a legal duty "affects" how an internet company "monitors" a website. *Id.*

The court rejected this argument, reasoning that HomeAway read *Internet Brands* too broadly.

> We do not read *Internet Brands* to suggest that CDA immunity attaches any time a legal duty might lead a company to respond with monitoring or other publication activities. It is not enough that third-party content is involved; *Internet Brands* rejected use of a "but-for" test that would provide immunity under the CDA solely because a cause of action would not otherwise have accrued but for the third-party content. We look instead to what the duty at issue actually requires: specifically, *whether the duty would necessarily require an internet company to monitor third-party content.*

*Id.* at 682 (citations omitted) (emphasis added).

Applying this standard, the court held that the ordinance fell outside of the CDA's immunity for three reasons. First, the ordinance did not require HomeAway (or any platform) to monitor third-party content. Instead, the ordinance prevented *the platforms* from undertaking a specific action—processing transactions for unregistered properties. *Id.* The ordinance did not require HomeAway to review content provided by the third-party hosts that list properties on the platform. Rather, "the only monitoring that appears necessary in order to comply with the Ordinance relates to incoming requests to complete a booking transaction—content that, while *resulting from* the third-party listings, is distinct, internal, and nonpublic." *Id.* Likewise, the duty to cross-reference bookings against Santa Monica's property registry did not require "monitoring" of third-party content because this conduct was not "'publication' of third-party content." *Id.* (noting that HomeAway had no editorial control over the City's registry and that the ordinance could fairly charge parties with keeping abreast of the law).

Second, the ordinance did not "proscribe, mandate, or even discuss the content of the listings that . . . [p]latforms display on their websites." *Id.* The court rejected HomeAway's argument that in practice the ordinance would require them to remove third-party content because it would not make sense to keep "un-bookable listings" posted. *Id.* Even accepting that removing the listings would be the best option "from a business standpoint," nothing in the ordinance required this outcome. Because the underlying duty could have been satisfied without changes to content posted by the website's users—not postings by the website itself—Section 230 immunity did not apply. *Id.*

Finally, the ordinance did not impose "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* HomeAway argued that the ordinance conflicted with the CDA's goal to preserve a vibrant and competitive free Internet market unfettered by federal and state regulation. *Id.* The court rejected this argument, noting that the Ninth Circuit has "consistently eschewed an expansive reading of the statute that would render

unlawful conduct 'magically . . . lawful when [conducted] online,' and therefore 'giv[ing] online businesses an unfair advantage over their real-world counterparts." *Id.* (quoting *Roommate.com*, 521 F.3d at 1164 & n.15).

*HomeAway*, like *Roommates.com* and *Internet Brands*, confirms that Section 230 immunity is not limitless. It clarifies *Internet Brands*' holding that a platform's interaction with a third-party, without more, does not confer Section 230 immunity. Instead, immunity attaches when a court's intervention would *require* a platform to censor, edit, or post third-party content. That is, the relevant question is what outcome will a court's order achieve? Will the court reach a website's personal bad act, or will it seek to hold the website liable for failing to remedy the bad act of another? It is thus improper to view the attachment of immunity as an "exception" or a "rule." Section 230 immunity is circumstantial. Its applicability depends on whether the facts alleged attempt to hold a website liable for the bad acts of another. Therefore, courts must look closely at the facts alleged and ask who is responsible for the charged, illegal conduct. *Id.* at 683 ("[T]he CDA does not provide internet companies with a one-size-fits-all body of law."). Indeed, websites may not evade federal, state, and local regulation simply because they host third-party content. "Like their brick-and-mortar counterparts, internet companies must also comply with any number of local regulations concerning, for example, employment, tax, or zoning." *Id.*

Interestingly, *HomeAway* also anchors its interpretation of the CDA to *Stratton Oakmont*, the case that sparked section 230. In rejecting HomeAway's argument that denying immunity would defeat the purposes of the CDA, the court noted that "the [o]rdinance would not pose an obstacle to Congress's aim to encourage self-monitoring of third-party content." *Id.* at 683–84. While the CDA's immunity reaches beyond *Stratton Oakmont*, "the initial state court that sparked its enactment," the holding of *Stratton Oakmont* remains important to understanding the scope of the CDA. "Congress intended to 'spare interactive computer services [the] grim choice' between voluntarily filtering content and being subject to liability on the one hand, and 'ignoring all problematic posts altogether [to] escape liability.'" *Id.* (quoting *Roommates.com*, 521 F.3d at

1163–64). In holding that Section 230 did not immunize HomeAway, the court noted that Section 230's goals were not applicable because HomeAway "face[d] no liability for the *content* of the bookings; rather, any liability arises only from unlicensed bookings." *Id.* (emphasis added). Accordingly, when evaluating whether Section 230 applies, courts must assess if liability would force a platform to unwillingly censor third-party content as *Stratton Oakmont* required.

**7. *Gonzalez v. Google LLC***

In *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), the court addressed three appeals arising from separate acts of terrorism—one in Paris, one in Istanbul, and one in San Bernardino—in which Nohemi Gonzalez, Nawras Alassaf, Sierra Clayborn, Tin Nguyen, and Nicholas Thalasinos lost their lives. The foreign terrorist organization known as ISIS took credit for the attacks. The plaintiffs were members of the victims' families. The plaintiffs sued Google, Twitter, and Facebook for damages pursuant to the Anti-Terrorism Act, alleging that the social medica platforms were secondarily liable for the murders because the platforms knowingly allowed ISIS to post videos and other content to communicate its message of terror and to radicalize new recruits. *Id.* at 880. The plaintiffs specifically alleged that Google's YouTube platform used computer algorithms to match and suggest content to users based on their viewing history. This caused YouTube to recommend ISIS videos to users and enabled users to locate other ISIS content. *Id.* at 881–82. The plaintiffs also claimed that Google placed paid advertisements in proximity to ISIS-created content and shared the resulting ad revenue with ISIS. *Id.* at 880.

Regarding the second element[3] of the *Barnes* test, the court held that the plaintiffs' claims treated Google as the publisher or speaker of third-party material. The plaintiffs argued that their claims did not treat Google as the publisher, but instead imposed a "duty not to support terrorists." *Id.* at 891. As support, the plaintiffs argued that just as a brick-and-mortar retailer like Wal-Mart

[3] There was no dispute that the first element was met.



United States District Court
Northern District of California

is prevented from supplying materials to ISIS, Google is prohibited from supplying ISIS a communication platform. *Id.* In rejecting this argument, the court noted that the plaintiff's characterization of their claim as asserting a "duty not to support terrorists" overlooks that publication itself is the form of support Google allegedly provided to ISIS. *Id.* Problematically, the plaintiffs' claim—that Google failed to prevent ISIS from using its platform, and thereby allowed ISIS to disseminate its message of terror—seeks to impose liability based on ISIS's mere use of YouTube. Because "publishing encompasses 'any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online," the claim sought to treat Google as a publisher and was barred by Section 230. *Id.* (quoting *Roommates.com*, 521 F.3d at 1170–71).

Regarding the third element of the *Barnes* test, the court held that "an interactive computer service does not create or develop content by merely providing the public with access to its platform." *Id.* at 893. While the plaintiffs conceded that Google did not create any of the ISIS videos, they argued that Google created the "mosaics" by which the videos are delivered. *Id.* The plaintiffs argued that Google made a material contribution to the unlawfulness of ISIS content by pairing it with selected advertising and other videos because the "pairing" enhanced user engagement with the underlying content. *Id.* The court rejected this argument, reasoning that Ninth Circuit "case law forecloses the argument." *Id.*

Relying on *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093 (9th Cir. 2019) and *Carafano*, the court concluded that Google's recommendation of content and its targeted advertising operated like a traditional search engine. *Gonzalez*, 2 F.4th at 894–95. Like a traditional search engine, which provides content in response to a user's queries, Google simply matched "what it knows about users based on their historical actions and sends third-party content to users that Google anticipates they will prefer." *Id.* at 895. The plaintiffs neither alleged that Google specifically targeted ISIS content nor designed its website to encourage videos that further the terrorist group's mission. *Id.* Instead, the plaintiffs allege that Google "provided a *neutral*

platform that did not specify or prompt the type of content to be submitted, nor determine particular types of content its algorithms would promote." *Id.*; *see also Force v. Facebook, Inc.*, 934 F.3d 53, 70 (2d Cir. 2019) (holding that Facebook's algorithms may have made content more visible or available, but this did not amount to *developing* the underlying information).

The plaintiffs also asserted a revenue-sharing theory of liability. *Gonzalez*, 2 F.4th at 897. This theory was premised on the allegation that because Google shared advertising revenue with ISIS, Google should be held directly liable for providing material support to ISIS and secondarily liable for providing substantial assistance to ISIS in violation of the Anti-Terrorism Act. *Id.* at 898. The court held that section 230 did not immunize Google from the claims premised on revenue-sharing.

The plaintiffs alleged that Google generated revenue by selling space through its AdSense program, including advertising space that appeared on YouTube. Through AdSense, Google sold advertising opportunities and displayed advertisements to YouTube viewers accessing other content. The plaintiffs alleged that each YouTube video was reviewed and approved prior to Google permitting advertisements to be placed on the video, and thus Google reviewed and approved the ISIS videos for advertising. The plaintiffs alleged that because Google approved ISIS videos for the AdSense programs, Google shared a percentage of the revenues generated from those advertisements with ISIS. *Id.*

The court concluded that these allegations were not directed to the publication of third-party information. *Id.* Instead, the allegations were premised on Google providing ISIS with material support by remitting money to ISIS. *Id.* Unlike the plaintiffs' other allegations, the revenue-sharing theory did not depend on the particular content ISIS placed on YouTube. The theory depended only on *Google's* unlawful payments of money to ISIS. *Id.*

*Gonzalez* reaffirms that section 230 does not apply to a platform's *own* bad acts. In distinguishing between the two sets of claims, the court premised immunity on control. "Perhaps the best indication that the [plaintiffs'] revenue-sharing allegations are not directed to any third-

United States District Court
Northern District of California

party content is that *Google's violation of the [Anti-Terrorism Act] could be remedied without changing any of the content posted by the YouTube's users*." *Id.* (emphasis added). Underlying this reasoning is a foundational understanding of what Section 230 sought to protect: website operators from liability based on a third-party's bad acts.

> Section 230's use of the phrase "publisher or speaker" was prompted by a New York state-court decision that held an internet service provider legally responsible for a defamatory message posted to one of its message boards. *Roommates*, 521 F.3d at 1163 (*citing Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995) (unpublished)). *Stratton Oakmont* concluded that the internet service provider "had become a 'publisher' under state law because it voluntarily *deleted* some messages from its message boards 'on the basis of offensiveness and bad taste,' and was therefore legally responsible for the content of defamatory messages that it failed to delete." *Id.* (emphasis added) (internal quotation marks omitted) (quoting *Stratton Oakmont*, 1995 WL 323710, at *4). The original goal of § 230 was modest. By passing § 230, Congress sought to allow interactive computer services "to perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete." *Id.*

*Gonzalez*, 2 F.4th at 887. Accordingly, and as established by cases like *Roommates.com* and *Internet Brands*, liability turns on the degree of control that a website exercises over the offensive content. Section 230 is not limitless. While its origin demonstrates a preference for immunity, it is not meant to immunize a website's own bad acts. With this in mind, the Court applies the relevant Ninth Circuit law to the facts of this case.

**C. Application of Section 230**

As noted, section 230 of the CDA "protects certain internet-based actors from certain kinds of lawsuits." *Barnes*, 570 F.3d at 1099. "The majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quotation marks and citation omitted). Of course, and as analyzed, this grant of immunity is not unlimited. *See Roommates.com*, 521 F.3d at 1162 ("This grant of immunity applies only if the interactive computer service provider is not also an

United States District Court
Northern District of California

'information content provider,' which is defined as someone who is 'responsible, in whole or in part, for the creation or development of' the offending content." (quoting 47 U.S.C. § 230(f)(3))).

As distilled from the above cases, a website does not become responsible for the development of a third-party's offensive content merely by providing "neutral tools" that a third-party might use to create the offensive content. *Id.* at 1169. Thus, to determine if Section 230 immunizes a website, the court must determine the degree to which the website contributed to "the alleged illegality of the conduct." *Id.* at 1168. In this sense, section 230 operates to prevent a website from being vicariously liable for the acts of a third-party contributor. The operative question is therefore: does the plaintiff seek to hold a website liable for its *own* bad conduct or for the bad conduct of another?

To answer this question, the Ninth Circuit created a three-prong test for Section 230 immunity. "Immunity from liability exists for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes*, 570 F.3d at 1100–01. Only the second element of the *Barnes* test is at issue. The Parties agree that the Platforms are interactive computer services and that the applications at issue were created by third parties. However, as this Court noted above, there is significant overlap between the second and third elements of the *Barnes* test. Indeed, allegations that a platform helped develop or create illegal content through data-sharing are certainly relevant to understanding whether the platform behaved as a "publisher or speaker" of third-party content.

Plaintiffs assert three theories of liability. One is premised on a non-revenue theory of liability and argues that the Platforms are liable because they promoted the illegal casino applications in their App Stores and thus induced users to play the illegal games. This is of the same nature as the non-revenue-based claim discussed in *Gonzalez*. The remaining two are premised on revenue theories of liability and argue that the Platforms are liable for *their own* illegal acts of selling gambling chips and working with developers to increase user engagement to

drive revenue.

- The Platforms are liable for their acts of "offering, categorizing, and promoting" social casino applications in their respective App Stores, and applying special rules to the social casino applications.

- To play the social casino apps, users must buy virtual chips through the Platforms. *See* Google Complaint ¶ 61; Apple Complaint ¶ 63; Facebook Complaint ¶ 60 (alleging that the Platforms operated as "the payment processor for all in-app purchases of virtual chips in the Illegal Slots"). These virtual chips can only be used inside the social casino apps, and "[s]ubstantially all virtual chips are used on slot machine spins." Google Complaint ¶ 63; Apple Complaint ¶ 65; Facebook Complaint ¶ 62. The Platforms thus aid in the exercise of illegal gambling by selling chips that are "substantially certain" to be "used to wager on a slot machine spin." Opp. at 6.

- The Platforms are closely involved in social casinos' business strategies. For example, the Platforms and social casino app developers work together to "monitor the game activity and use the collected data to increase user spending." Google Complaint ¶ 88; Apple Complaint ¶ 91; Facebook Complaint ¶ 81. The Platforms and the developers also "work together to target and exploit high-spending users, or 'whales.'" Google Complaint ¶ 89; Apple Complaint ¶ 92; Facebook Complaint ¶ 82. For example, Apple aids in the design and direction of targeted advertising to retain users and attract new users, Apple Complaint ¶ 94; Facebook provides "App Ads" which allow Illegal Slot companies to target high spending users and activate non-spending users and sends targeted ads offering in-game rewards to users who invite their Facebook friends to play the social casino apps, Facebook ¶¶ 80, 84; and Google aids in the design and direction of targeted advertising aimed at attracting and retaining users of the social casino apps, Google Complaint ¶ 91.

Plaintiffs' first theory of liability, a non-revenue claim, is easily dismissed under section 230. The recommendations and notifications in *Dyroff* and *Gonzalez* are not meaningfully different than the promotions of the social casino apps provided by the Platforms in the cases at issue here. Allegations that the Platforms are liable for actions that rely on algorithms to "amplify and direct users to content," like the social casino apps, cannot withstand section 230's grant of immunity. *Gonzalez*, 2 F.4th 871; *Dyroff*, 934 F.3d at 1099 ("The recommendation and notification functions helped facilitate this user-to-user communication, but it did not materially contribute, as Plaintiff argues, to the alleged unlawfulness of the content.").

United States District Court
Northern District of California

Unlike Plaintiffs' first theory of liability, which attempts to hold the Platforms liable in their "editorial" function, Plaintiffs' second theory of liability seeks to hold the Platforms liable for their own conduct. Importantly, the conduct identified by Plaintiffs in their complaints is alleged to be unlawful. As alleged, players must buy virtual chips from the Platforms app stores and may only use these chips in the casino apps. It is this sale of virtual chips that is alleged to be illegal. Plaintiffs neither take issue with the Platforms' universal 30% cut, nor the Platforms' virtual currency sale. Plaintiffs only assert that the Platforms role as a "bookie" is illegal. Plaintiffs therefore do not attempt to treat the Platforms as "the publisher or speaker" of third-party content, but rather seek to hold the Platforms responsible for their own illegal conduct—the sale of gambling chips. *Compare Taylor v. Apple, Inc.*, No. 46 Civ. Case 3:20-cv-03906-RS (N.D. Cal. Mar. 19, 2021) ("Plaintiffs' theory is that Apple is distributing games that are effectively slot machines—illegal under the California Penal Code. . . . Plaintiffs are seeking to hold Apple liable for selling allegedly illegal gaming devices, not for publishing or speaking information."), *with Coffee v. Google, LLC*, 2022 WL 94986, at *6 (N.D. Cal. Jan. 10, 2022) ("In the present case, Google's conduct in processing sales of virtual currency is not alleged to be illegal. To the contrary, the [Complaint] states that '[v]irtual currency is a type of *unregulated* digital currency that is only available in electronic form.' If indeed the sale of Loot Boxes is illegal, the facts alleged in the FAC indicate that such illegality *is committed by the developer who sells the Loot Box for virtual currency, not by Google*." (second alteration in original) (emphasis added)).

Plaintiffs' second "revenue-based" theory of liability is like the revenue-based claim found actionable in *Gonzalez* and *HomeAway*. In *Gonzalez*, liability attached to Google's action of funding terrorism in violation of the Anti-Terrorism Act. In *HomeAway*, liability attached to the website's unlawful transactions for unregistered properties. Likewise, here, Plaintiffs seek to impose liability for the Platforms processing of *unlawful* transactions for *unlawful* gambling. Accordingly, the requested relief is grounded in the Platforms' own bad acts, not in the content of the social casino apps that the Platforms display on their websites.

Plaintiffs' third theory of liability is admittedly the trickiest. To decide whether Plaintiffs attempt to hold the Platforms liable as "publishers or speakers" of third-party content, the Court must determine whether the Platforms operated in a manner that contributes to the alleged illegality. As distilled from the above analysis, the focus of this inquiry is on the Platform's neutrality—are the tools provided neutral such that the third party is solely responsible for the alleged illegality *or* do the tools provided aid in and encourage the alleged illegality? Problematically, the third theory of liability is much like the "recommendations" found non-actionable in *Gonzalez*. Like the recommendations provided by YouTube, the Platforms' recommendations (*i.e.*, targeted advertisements) communicated to each user that the Platforms thought the user would be interested in the social casino apps. That the recommended connection was to an application openly engaged in illegal activity is of no consequence. On the other hand, the Platforms are alleged to not just have recommended content, but to have helped develop specific advertisements meant to attract users to the social casino apps. In this sense, Plaintiffs hold the Platforms liable for sharing data with the social casino app developers to make their illegal product more appealing and addicting. Further, Plaintiffs point out that the Platforms had an incentive to do so. The social casino apps bring the Platforms significant profits. Making the games more appealing and addicting through data driven analytics inures to the benefit of the Platforms. Nonetheless, unlike *Roommates.com*, where the website actively elicited responses that formed the basis of violations of the Fair Housing Act, Plaintiffs do not allege that the Platforms contribution of data and advertisements helped create and develop the application itself. Moreover, unlike *Internet Brands*, where conduct did not involve the website's behavior as a "website," this case directly turns on how the Platforms aid the social casino developers in developing social casino apps. The Platforms are thus acting in their role as a "platform." In this sense, the Platforms behavior is more like the editor in *Batzel*. Just as the editor in *Batzel* bettered the post by making minor edits and bettered the website by choosing which messages to post, the Platforms have behaved as "editors" by helping develop the social casino apps using big data to

make the games more profitable and more addicting. Providing social casino developers with big data is like an editor providing edits or suggestions to a writer. Indeed, the Platforms sharing of data is comparable to the recommendations found non-actionable in *Gonzalez*. Because the Platforms sharing of data is fairly seen as a classic editorial role, section 230 immunizes this conduct.

The Court holds that Plaintiffs' first and third theories of liability must be dismissed under section 230. However, Plaintiffs' second theory of liability is not barred by section 230. The Court thus **GRANTS in part and DENIES in part** Defendants' respective motions to dismiss.

Finally, the Court joins other opinions that note that the history of section 230 does not support a reading of the CDA so expansive as to reach a websites-generated message and functions. *See, e.g.*, *Gonzalez*, 2 F.4th at 913 (Berzon, J., concurring); *Force*, 934 F.3d at 76 (Katzmann, C.J., concurring in part and dissenting in part). As analyzed, the twin goals of section 230 do not support this broad reading. Immunizing a website's own targeted advertisements and algorithms does not advance a website's internal policing of indecent content or promoting third-party speech. The data-driven targeting of consumers by big social-media platforms can hardly be compared to the Internet of 1996. Platforms like Facebook, Google, and Apple are more than mere message boards, they are creators of content themselves, and they should be treated as such.

**D. Interlocutory Appeal**

Generally, an appellate court should not review a district court's ruling until after entry of final judgment. *See In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1982). However, there is an important exception. 28 U.S.C. § 1292(b) allows a district judge to certify an order for interlocutory appeal.

Certification pursuant to 28 U.S.C § 1292(b) has been interpreted to depend on four factors. A district court may certify an order for interlocutory appeal if (1) "the appeal involves a controlling question of law," (2) there is a "substantial ground for difference of opinion" on that question, (3) "an immediate appeal would materially advance the ultimate termination of the

United States District Court
Northern District of California

litigation," and (4) failure to certify the order "would result in wasted litigation and expense." *See Hawaii ex rel. Louie v. JP Morgan Chase & Co.*, 921 F. Supp. 2d 1059 (D. Haw. 2013). A district court may certify an order *sua sponte*. *See* Fed. R. App. P. 5(a). After a district court certifies an order for interlocutory appeal, the circuit court must in its discretion decide whether to certify the appeal. *See* 28 U.S.C. § 1292(b). Interlocutory appeals are "applied sparingly and only in exceptional cases." *United States v. Woodbury*, 263 F.2d 784, 788 n. 11 (9th Cir. 1959). A district court generally should not permit such an appeal where it "would prolong the litigation rather than advance its resolution." *Syufy Enter. v. Am. Multi–Cinema, Inc.*, 694 F. Supp. 725, 729 (N.D. Cal. 1988).

This case presents exceptional circumstances that are sufficient to justify an interlocutory appeal. Immediate appeal on the section 230 immunity issue would help advance this action and avoid unnecessary litigation. This case involves controlling questions of law, namely whether the Platforms are entitled to immunity for their hosting of the allegedly unlawful social casino apps. While the Court believes it has followed the Ninth Circuit's precedent on this complicated question, the Court finds that reasonable minds could differ as to the outcome of this case. Finally, the Court finds that immediate appeal would materially advance the ultimate termination of the litigation and would ensure that resources are not wasted on needless litigation and expenses. If the Ninth Circuit reverses this Court as to Plaintiffs' second theory of liability, the case is resolved in its entirety. However, if interlocutory appeal is not granted and the Ninth Circuit reverses this Court's holding as to Plaintiffs' second theory of liability after final judgment is entered, it would be a significant and needless waste of the Court and the Parties' resources.

## IV. CONCLUSION

For the foregoing reasons the Court **GRANTS in part and DENIES in part** Defendants' respective motions to dismiss. The Court *sua sponte* **CERTIFIES THIS ORDER FOR IMMEDIATE INTERLOCTUORY APPEAL.** This action is **STAYED** pending determination from the Ninth Circuit Court of Appeals as to whether it will accept certification. The Parties are

United States District Court
Northern District of California

**ORDERED** to file a joint status report with the Court after the Court of Appeals has decided whether to certify the interlocutory appeal or in six months, whichever occurs first.

**IT IS SO ORDERED.**

Dated: September 2, 2022

EDWARD J. DAVILA
United States District Judge